Complaint

Failure to represent a member as stated in the Council 31 AFSCME Contract Agreement, July 1, 2012 – June 30, 2015. Non-Discrimination, Article 111; Grievance Procedure, Article V: Discipline, Article IX. Records and forms, Article XVII. Due to racial discrimination.

I was targeted for an Interim evaluation on May 10th, 2017. All staff, including myself, at my office location had received an annual evaluation in December 2016. However, I believe that I was the only staff who was targeted and received an interim evaluation in 2017. I was given another annual evaluation on September 15th, 2017.Lisa Eden, failed to file a grievance on my behalf.

On May 15th, 2017 I had a counseling meeting with my LOA, Patricia Herker. She presented charges against me to which I submitted my rebuttal. Lisa Eden failed to file a grievance.

On June 17, 2017 I had a Pre-disciplinary meeting with Patricia Herker, LOA. to which I submitted my rebuttal on June 26th.  On June 27th I receive a notice for a 5 day suspension from Patricia Herker, LOA. On June 29th Lisa Eden filed a grievance on my behalf, Grievance Number 628658, for management's failure to follow progressive and corrective discipline.

In regards to this grievance that was filed on June 29th, 2017, the processing was untimely.

On July 11, 2017 I had a Pre-disciplinary meeting with Patricia Herker, LOA. I submitted my rebuttal on July 13th. Lisa Eden, my union representative failed to file a grievance.

On August 7th I receive a 7 day suspension from Patricia Herker, LOA for which I had not been given prior notice. I had taken time of on Friday, August 4th, 2017. When I returned to work on Monday, August 7th I signed in and went to my desk. It was at this point that I got an email message for Patricia Herker, LOA to come to her office. She told me that I was suspended for 7 days starting on Monday, August 7th, 2017.  She gave me the paperwork to sign and said I should turn my keys in and go home. Other staff were asking me why I was leaving, needless to say it was a very embarrassing situation. This was done intentionally by Patricia Herker, LOA to embarrass me. Lisa Eden, union steward had knowledge of this pending suspension but failed to notify me. When I returned to work on Monday, August 14th, 2017 I sent the suspension notice in an email to Lisa Eden. She failed to file a grievance on my behalf regarding this 7 day suspension which began on August 7th, 2017.  Lisa Eden also failed to file a grievance regarding this embarrassing situation that I experience.

On August 17th, 2017 I had a Pre-disciplinary meeting with Patricia Herker, LOA. I submitted my rebuttal on August 23rd, 2017. Lisa Eden failed to investigate the points in my rebuttal or to file a grievance. On September 8th, 2017 I had a Pre-disciplinary meeting with Patricia Herker, LOA. I submitted my rebuttal on September 15th, 2017. Lisa Eden failed to file a grievance.

In October 2017, there was a dispute regarding an unexcused absence. Lisa Eden said she would file a grievance on my behalf. The grievance she filed on my behalf was denied on the same day it was filed, However, later when the union realized that I had filed a Case with the EEOC they processed the grievance. I also requested the union to file grievances on my behalf for denial of training and falsification of documents against Patricia Herker, LOA. Lisa Eden, failed to file a grievance.

Jennifer Dunkley                    12/19/2018



**State of Illinois**
Department of Central Management Services

**Individual Development and Performance System**

| 1. EMPLOYEE'S NAME - LAST, FIRST, MIDDLE | 2. DEPARTMENT, BOARD OR COMMISSION | 3. DIVISION OR INSTITUTION |
|---|---|---|
| DUNKLEY, JENNIFER | Department of Human Services | Family and Community Services |

| 4. EMPLOYEE'S SOCIAL SECURITY NUMBER | 5. EMPLOYEE'S PAYROLL TITLE | 6. TIME IN TITLE |
|---|---|---|
| ███3 - ██ - ████ | Public Aid Eligibility Assistant | 1 YRS  4 MONTHS |

**7. PERIOD OF REPORT**

From: 09-01-2015
To: 08-31-2016

**8. TYPE OF REPORT**

☒ ANNUAL   ☐ FIRST PROBATIONARY   ☐ LAYOFF   ☐ OTHER (SPECIFY)
☐ QUARTERLY   ☐ FINAL PROBATIONARY   ☐ DISCHARGE
☐ INTERIM   ☐ SALARY INCREASE

## GENERAL INFORMATION

The basic purpose of the Individual Development and Performance System is to let employees know how they are doing, to motivate them, to improve their performance and to justify administrative personnel decisions.

The system attempts to minimize subjective judgments by utilizing a work planning concept of objective setting and feedback. Thus, it helps employees control and evaluate their progress toward personal as well as organization objectives.

Central Management Services requests disclosure of information that is necessary to accomplish its obligations, primarily the statutory purposes outlined under the Personnel Code (20 ILCS 415). Social Security numbers are used in the application and employment processes to identify and differentiate between candidates and/or employees. Confidentiality of Social Security numbers obtained through this form will be preserved as prescribed by 5 ILCS 179 et seq.

The establishment of employee objectives is a five-step process which is illustrated as follows:

| | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 |
|---|---|---|---|---|---|
| SUPERVISOR'S RESPONSIBILITY | Set and communicate appropriate objectives. | Prepare a list of objectives with employee. Discuss work objectives for this period. | Approve plans of action for achieving work objectives and review with higher management. | Review progress. Make adjustments as required. Provide coaching and assistance. | Evaluate performance and results for annual appraisal. Prepare list of objectives for next period. |
| INFORMATION TO SHARED | Organization objectives; self-development needs. | OBJECTIVE SETTING | PLANS OF ACTION FOR JOB TO BE DONE | QUARTERLY PROGRESS REVIEW | EVALUATE PERFORMANCE ANNUALLY; RESET OBJECTIVES |
| EMPLOYEE'S ROLE | Discuss areas of responsibility relating to objectives and self-development needs. | Prepare list of objectives for discussion with supervisor. Discuss work objectives for this period. | Prepare plans of action to meet objectives for approval of supervisor. Perform the job to be done. | Review progress. Discuss any problems with supervisor. | Make self-evaluation and evaluation results for annual appraisal. Prepare list of objectives for next period. |

Each employee will be counseled by his supervisor and a copy of this form filed in the individual's personnel folder not less than once every 12 months. Results of quarterly progress review sessions need to be recorded only on copies retained by the employee and supervisor. **A manual is available which may be obtained from the Department of Central Management Services, Bureau of Personnel.**

A minimum of three copies of this form will be prepared - one for the supervisor, one for the employee, and one for the personnel files. Additional copies may be prepared if needed. If employee's position is at a level (unskilled, etc.) that does not lend itself to objective setting, indicate by inserting "N/A" (not applicable) wherever necessary.

## REVIEW OF JOB DESCRIPTION

Review of the employee's job description is required to ensure the accuracy of the job description.
Does the job description accurately and directly relate to the objectives listed in the next part of this evaluation form?

☒ Yes   ☐ No   If No, attach a revision of the job description.

CMS201 (Ver 6/15)

EMPLOYEE NAME:   DUNKLEY, JENNIFER

| PART I. APPRAISAL OF OBJECTIVES Supervisor is to list and evaluate all objectives for which the employee was held accountable during the last reporting period. Mark the appropriate column with an "X" for each objective. Each box will expand as needed. | Objectives | | |
| --- | --- | --- | --- |
| | Exceeded | Met | Not Met |
| Promote and maintain positive customer, community and office relations. Assure all visitors and coworkers are treated with dignity, courtesy and respect. | | X | |
| Ensure accurate and timely registration of all applications/redeterminations in IES and/or ACM. | | X | |
| Accurately provide coverage at the front desk. | | X | |
| Process outgoing mail daily to be completed by 10:00 AM. | | X | |
| Maintain HIPPAA by protecting the privacy and confidentiality of customers and staff by ensuring completion of Netlearning training HIPAA I, II & III, PIPA, and Administrative Directive 01.02.03.140 | X | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

CMS201  (Ver 6/15)

EMPLOYEE NAME:  DUNKLEY, JENNIFER

| PART II. GENERAL APPRAISAL OF EMPLOYEE PERFORMANCE | | TO BE COMPLETED BY EMPLOYEE | | | TO BE COMPLETED BY SUPERVISOR | | | |
|---|---|---|---|---|---|---|---|---|
| Complete Items 1 through 8 for all employees and Items 9 and 10 when applicable. Differences between ratings by employee and by supervisor must be discussed. | | Exceeds Expectations | Meets Expectations | Needs Improvement | Exceeds Expectations | Meets Expectations | Needs Improvement | Insufficient Opportunity to Observe |
| 1. JOB KNOWLEDGE: | Knowledge of duties and responsibilities as required for current job or position. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 2. PRODUCTIVITY: | Amount of work generated and completed successfully as compared to amount of work expected for this job or position. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 3. QUALITY: | Correctness, completeness, accuracy and economy of work - overall quality. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 4. INITIATIVE: | Self motivation - amount of work required - seeks improved methods and techniques - consistency in trying to do better. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 5. USE OF TIME: | Uses available time wisely - is punctual reporting to work - absenteeism - accomplishes required work on or ahead of schedule. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 6. PLANNING: | Sets realistic objectives - anticipates and prepares for future requirements - establishes logical priorities. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 7. FOLLOW-UP: | Maintains control of workloads - allocates resources economically - insures that assignments are completed accurately and timely. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 8. HUMAN RELATIONS: | Establishes and maintains cordial work climate - promotes harmony and enthusiasm - displays sincere interest in assisting other employees. | ○ | ◉ | ○ | ○ | ◉ | ○ | ○ |
| 9. LEADERSHIP: ☒ N/A | Sets high standards - provides good managerial example - encourages subordinates to perform efficiently - communicates effectively. | | | | | | | |
| 10. SUBORDINATE DEVELOPMENT: ☒ N/A | Helps subordinates plan career development - trains potential replacements - gives guidance and counsel. | | | | | | | |

CMS201  (Ver 6/15)

EMPLOYEE NAME:   DUNKLEY, JENNIFER

**PART III:  REMARKS BY SUPERVISOR**

Document the ratings checked in Part I and II.

Comment on employee's outstanding achievements.  When "not met" is checked in Part I or "needs improvement" is checked in Part II, describe the reasons for this rating and what remedial steps were taken.  This box will expand as needed.

Jennifer has been a PAEA now for 16 months.  She is very thoughtful and respectful to everyone she talks to.  During the past few months she has had to assume the responsibility of covering the front desk full time.  She will also start assuming the responsibility of ordering office supplies and to submit the monthly postage meter report.  Jennifer has had minimal unplanned absences during this reporting period.

**PART IV.  EMPLOYEE OBJECTIVES FOR NEXT REPORTING PERIOD**

To be established by the supervisor with input from the employee.  Objectives should be set for each major area of job responsibility, ranked in priority order, and be as measurable as possible.  Personal development objectives may be included.  Each box will expand as needed.

See attachment.

EMPLOYEE NAME:   DUNKLEY, JENNIFER

## PART V.  EMPLOYEE'S COMMENTS

Employees may comment on all or any part of the information contained in this document, including the evaluation process. If the employee does not concur with the evaluation, check the appropriate box in Part VI below and explain reasons for disagreement.

## PART VI.  SIGNATURES   ☐ Check for Digital Signature Version - Uncheck for Hardcopy Signature Version

*Jennifer Dunkley*

EMPLOYEE'S SIGNATURE — Public Aid Eligibility Assistant — PAYROLL TITLE — 12/30/2016 DATE

☐ I DO NOT CONCUR (use Part V for Comments).

SUPERVISOR'S SIGNATURE — PAYROLL TITLE — DATE

☐ I HAVE PERSONALLY DISCUSSED THE CONTENT OF THIS DOCUMENT WITH THE EMPLOYEE.

NEXT LEVEL SUPERVISOR (REVIEW) — PAYROLL TITLE — DATE

AGENCY HEAD'S SIGNATURE — DATE

CMS201  (Ver 6/15)

EMPLOYEE NAME:   DUNKLEY, JENNIFER

**PART VII.  QUARTERLY PROGRESS REVIEW (This can be initiated by either the employee or the supervisor.)**

The employee and supervisor may meet quarterly to review progress toward previously agreed upon objectives.  If the original objectives need to be adjusted, use the space below to document the change.  The employee and supervisor should date and initial the document at the time of each review.

| Progress Review Dates: | Initials: | Initials: |
|---|---|---|
| 1st Quarter: | Employee: | Supervisor: |
| 2nd Quarter: | Employee: | Supervisor: |
| 3rd Quarter: | Employee: | Supervisor: |

**PART VII.  Continued QUARTERLY PROGRESS REVIEW (Adjusted Objectives)**

The employee and supervisor may meet quarterly to review progress toward previously agreed upon objectives.  If these objectives need to be adjusted, use the space below to document these changes.  This box will expand as needed.

V.   Complete the following trainings:  New Employee HIPPA Orientation Training, Personal Information Protection Act (PIPA) Training, Administrative Directive: Protection of confidential and Personal Information 01.02.03.140 Training and the Annual Online HIPAA Training to be documented on the IL 444-4806.

Indicators: Completion of IL 444-4806

VI.   Supplies/Equipment/Inventory

A. Order all office supplies in a timely manner in a proactive manner.  Distribute and organize upon receipt.
B. Request and maintain adequate/appropriate equipment for staff to work effectively.
C. Maintain the office inventory by tracking the tagged equipment in the office.  Complete the annual inventory reconciliation report accurately and by the due date.

Indicators:  Maintain work area to provide a safe and organized work environment. LOA observation.

PART IV. PAEA OBJECTIVES FOR NEXT REPORTING PERIOD

I.      Promote and maintain positive customer, community, and office relations.

   A.    Assure that all visitors and coworkers are treated with dignity, courtesy and respect.   Maintain an
         attitude of dignity, understanding, compassion, and sensitivity in relation to co-workers.  Be alert to
         special needs of persons.  Keep communication open and professional.  Participate as a team member to
         accomplish goals with excellence and efficiency.
   B.    Follow guidelines of the Employee Handbook, including a very high level of confidentialty.
   C.    Participate as requested in local office planning and work groups.
   D.    Maintain an awareness of community resource information.  Make referrals which assist customers to
         remove barriers which keep them from attaining self-sufficiency and will improve their quality of life.

   Indicators:    Observations by LOA and co-workers

II.     Ensure accurate and timely registration of applications.
   A.    Complete ____ % (95 – 99%) of all registrations within 3 day time and schedule appointments within 14
         days of the application.
   B.    Schedule clients for expedited services at a rate of ____ (95 – 99%) timely.
   C.    Correctly complete the registration of ABE applications and route to correct queue at a rate of _____%
         (95 – 98%)
   D.    Correctly reschedule appointments utilizing IES calendar at a rate of ____ % (95 – 99%).
   E.    Correctly scan and upload case information.

   Indicators:  Random sample reviews

III.    Ensure accurate and timely follow-up and routing of PSI applications.
   A.    Daily, identify new PSI applications.  Print the application and run appropriate clearances.
   B.    Correctly determine if additional verifications are needed.  If needed, issue a 1721 for the correct
         verifications.   Make appropriate write-up and control for the return of the verifications.

   Indicators:   Random sample reviews

IV.     Perform various duties timely and accurately and follow-up as required.

   A.    Accurately provide coverage at the front desk and.
   B.    Process incoming and outgoing mail daily to be completed by 10:00 A.M. and 4:40 P.M
   C.    Ensure LINK cards are issued correctly and appropriate supply of LINK cards is on hand at all times.
   D.    Accurately complete transfer in and out of case records within three days receipt.

   Indicators:  Valid complaints, workers, and LOA observation.

State of Illinois
Department of Central Management Services

**Individual Development and Performance System**

| 1. EMPLOYEE'S NAME - LAST, FIRST, MIDDLE | 2. DEPARTMENT, BOARD OR COMMISSION | 3. DIVISION OR INSTITUTION |
|---|---|---|
| DUNKLEY, JENNIFER | Department of Human Services | Family and Community Services |
| **4. EMPLOYEE'S SOCIAL SECURITY NUMBER** | **5. EMPLOYEE'S PAYROLL TITLE** | **6. TIME IN TITLE** |
| [redacted] - [redacted] - [redacted] | Public Aid Eligibility Assistant | 1 YRS 8 MONTHS |

7. PERIOD OF REPORT

From: 01/01/2017

To: 05/01/2017

8. TYPE OF REPORT

☐ ANNUAL ☐ FIRST PROBATIONARY ☐ LAYOFF ☐ OTHER (SPECIFY)
☐ QUARTERLY ☐ FINAL PROBATIONARY ☐ DISCHARGE
☒ INTERIM ☐ SALARY INCREASE

## GENERAL INFORMATION

The basic purpose of the Individual Development and Performance System is to let employees know how they are doing, to motivate them, to improve their performance and to justify administrative personnel decisions.

The system attempts to minimize subjective judgments by utilizing a work planning concept of objective setting and feedback. Thus, it helps employees control and evaluate their progress toward personal as well as organization objectives.

Central Management Services requests disclosure of information that is necessary to accomplish its obligations, primarily the statutory purposes outlined under the Personnel Code (20 ILCS 415). Social Security numbers are used in the application and employment processes to identify and differentiate between candidates and/or employees. Confidentiality of Social Security numbers obtained through this form will be preserved as prescribed by 5 ILCS 179 et seq.

The establishment of employee objectives is a five-step process which is illustrated as follows:

| Step 1 | Step 2 | Step 3 | Step 4 | Step 5 |
|---|---|---|---|---|
| SUPERVISOR'S RESPONSIBILITY Set and communicate appropriate objectives. → | Prepare a list of objectives with employee. Discuss work objectives for this period. → | Approve plans of action for achieving work objectives and review with higher management. → | Review progress. Make adjustments as required. Provide coaching and assistance. → | Evaluate performance and results for annual appraisal. Prepare list of objectives for next period. |
| INFORMATION TO SHARED Organization objectives; self-development needs. → | OBJECTIVE SETTING → | PLANS OF ACTION FOR JOB TO BE DONE → | QUARTERLY PROGRESS REVIEW → | EVALUATE PERFORMANCE ANNUALLY; RESET OBJECTIVES |
| EMPLOYEE'S ROLE Discuss areas of responsibility relating to objectives and self-development needs. → | Prepare list of objectives for discussion with supervisor. Discuss work objectives for this period. → | Prepare plans of action to meet objectives for approval of supervisor. Perform the job to be done. → | Review progress. Discuss any problems with supervisor. → | Make self-evaluation and evaluation results for annual appraisal. Prepare list of objectives for next period. |

Each employee will be counseled by his supervisor and a copy of this form filed in the individual's personnel folder not less than once every 12 months. Results of quarterly progress review sessions need to be recorded only on copies retained by the employee and supervisor. **A manual is available which may be obtained from the Department of Central Management Services, Bureau of Personnel.**

A minimum of three copies of this form will be prepared - one for the supervisor, one for the employee, and one for the personnel files. Additional copies may be prepared if needed. If employee's position is at a level (unskilled, etc.) that does not lend itself to objective setting, indicate by inserting "N/A" (not applicable) wherever necessary.

## REVIEW OF JOB DESCRIPTION

Review of the employee's job description is required to ensure the accuracy of the job description.
Does the job description accurately and directly relate to the objectives listed in the next part of this evaluation form?

☒ Yes ☐ No If No, attach a revision of the job description.

EMPLOYEE NAME:   DUNKLEY, JENNIFER

| PART I. APPRAISAL OF OBJECTIVES Supervisor is to list and evaluate all objectives for which the employee was held accountable during the last reporting period. Mark the appropriate column with an "X" for each objective. Each box will expand as needed. | Objectives | | |
|---|---|---|---|
| | Exceeded | Met | Not Met |
| Promote and maintain positive customer, community and office relations. Assure all visitors and coworkers are treated with dignity, courtesy and respect. | | | x |
| Ensure accurate and timely registration of all applications/redeterminations in IES and/or ACM. | | x | |
| Accurately provide coverage at front desk. | | | x |
| Process outgoing mail daily to be completed by 10:00 AM. | | x | |
| Maintain HIPPAA by protecting the privacy and confidentiality of customers and staff by ensuring completion of Netlearning training HIPAA I, II, & III, PIPA, and Administrative Directive 01.02.03.140 | x | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## PART II. GENERAL APPRAISAL OF EMPLOYEE PERFORMANCE

Complete Items 1 through 8 for all employees and Items 9 and 10 when applicable. Differences between ratings by employee and by supervisor must be discussed.

| | | TO BE COMPLETED BY EMPLOYEE | | | TO BE COMPLETED BY SUPERVISOR | | | |
|---|---|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| | | Exceeds Expectations | Meets Expectations | Needs Improvement | Exceeds Expectations | Meets Expectations | Needs Improvement | Insufficient Opportunity to Observe |
| 1. JOB KNOWLEDGE: | Knowledge of duties and responsibilities as required for current job or position. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 2. PRODUCTIVITY: | Amount of work generated and completed successfully as compared to amount of work expected for this job or position. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 3. QUALITY: | Correctness, completeness, accuracy and economy of work - overall quality. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 4. INITIATIVE: | Self motivation - amount of work required - seeks improved methods and techniques - consistency in trying to do better. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 5. USE OF TIME: | Uses available time wisely - is punctual reporting to work - absenteeism - accomplishes required work on or ahead of schedule. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 6. PLANNING: | Sets realistic objectives - anticipates and prepares for future requirements - establishes logical priorities. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 7. FOLLOW-UP: | Maintains control of workloads - allocates resources economically - insures that assignments are completed accurately and timely. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 8. HUMAN RELATIONS: | Establishes and maintains cordial work climate - promotes harmony and enthusiasm - displays sincere interest in assisting other employees. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 9. LEADERSHIP: ☐ N/A | Sets high standards - provides good managerial example - encourages subordinates to perform efficiently - communicates effectively. | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| 10. SUBORDINATE DEVELOPMENT: ☐ N/A | Helps subordinates plan career development - trains potential replacements - gives guidance and counsel. | ● | ○ | ○ | ○ | ○ | ○ | ○ |

CMS201 (Ver 6/15)

EMPLOYEE NAME:  DUNKLEY, JENNIFER

## PART II.  GENERAL APPRAISAL OF EMPLOYEE PERFORMANCE

Complete Items 1 through 8 for all employees and Items 9 and 10 when applicable.  Differences between ratings by employee and by supervisor must be discussed.

| | | TO BE COMPLETED BY EMPLOYEE | | | TO BE COMPLETED BY SUPERVISOR | | | |
|---|---|---|---|---|---|---|---|---|
| | | Exceeds Expectations | Meets Expectations | Needs Improvement | Exceeds Expectations | Meets Expectations | Needs Improvement | Insufficient Opportunity to Observe |
| 1. JOB KNOWLEDGE: | Knowledge of duties and responsibilities as required for current job or position. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 2. PRODUCTIVITY: | Amount of work generated and completed successfully as compared to amount of work expected for this job or position. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 3. QUALITY: | Correctness, completeness, accuracy and economy of work - overall quality. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 4. INITIATIVE: | Self motivation - amount of work required - seeks improved methods and techniques - consistency in trying to do better. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 5. USE OF TIME: | Uses available time wisely - is punctual reporting to work - absenteeism - accomplishes required work on or ahead of schedule. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 6. PLANNING: | Sets realistic objectives - anticipates and prepares for future requirements - establishes logical priorities. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 7. FOLLOW-UP: | Maintains control of workloads - allocates resources economically - insures that assignments are completed accurately and timely. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 8. HUMAN RELATIONS: | Establishes and maintains cordial work climate - promotes harmony and enthusiasm - displays sincere interest in assisting other employees. | ◉ | ○ | ○ | ○ | ○ | ◉ | ○ |
| 9. LEADERSHIP: ☒ N/A | Sets high standards - provides good managerial example - encourages subordinates to perform efficiently - communicates effectively. | | | | | | | |
| 10. SUBORDINATE DEVELOPMENT: ☒ N/A | Helps subordinates plan career development - trains potential replacements - gives guidance and counsel. | | | | | | | |

CMS201  (Ver 6/15)

EMPLOYEE NAME:   DUNKLEY, JENNIFER

**PART III.   REMARKS BY SUPERVISOR**
Document the ratings checked in Part I and II.

Comment on employee's outstanding achievements.  When "not met" is checked in Part I or "needs improvement" is checked in Part II, describe the reasons for this rating and what remedial steps were taken.  This box will expand as needed.

Jennifer has been a PAEA now for 20 months.  She fails to follow instructions given to her by her supervisor.  She has previously questioned the LOA when given directions to complete a task or when she has made an error.  Jennifer has previously tried to blame someone else in the office for her mistakes and takes no ownership in her mistakes.  When e-mails are sent to Jennifer in regards to instructions she does not respond to them in a timely manner if at all.  She does not answer phone calls from customers in a timely manner and sometimes doesn't answer at all.  She at times places the caller on hold and requires them to call back as does not respond timely to the caller that is on hold.  When the office associate is helping customers from the lobby on by phone Jennifer does not step in to help the other customers waiting.  She has been spoken to several times regarding verifications being placed in the proper place but continues to ignore those directions and places in incorrect drawers causing applications to not be registered timely or causing applications to be denied.  She has been spoken to numerous times about incoming mail being taken care of daily by 2:00 pm and fails to complete this task daily.  She will not answer general questions on the phone as she states it is not her job to answer questions and then the caseworkers would be dong less of their job.  She was given a copy of Receptionist Service Guide in 01/2017 so that she could answer general questions about programs and such but still fails to do that.  We have had several anonymous phone calls complaining that Jennifer is rude to them on the phone and will not answer their questions.  Jennifer has stated several times in front of other staff members that this is all a game and you just have to know how to play it.  Unless is it involves registering an application or the mail Jennifer does not want to help out in any way and staff complain that she is not a Team Player and acts as if she doesn't want to be.

**PART IV.   EMPLOYEE OBJECTIVES FOR NEXT REPORTING PERIOD**

To be established by the supervisor with input from the employee.  Objectives should be set for each major area of job responsibility, ranked in priority order, and be as measurable as possible.  Personal development objectives may be included.  Each box will expand as needed.

See attached.

CMS201  (Ver 6/15)

EMPLOYEE NAME:   DUNKLEY, JENNIFER

## PART V. EMPLOYEE'S COMMENTS

Employees may comment on all or any part of the information contained in this document, including the evaluation process. If the employee does not concur with the evaluation, check the appropriate box in Part VI below and explain reasons for disagreement.

See attached

## PART VI. SIGNATURES   ☐ Check for Digital Signature Version - Uncheck for Hardcopy Signature Version

| Jennifer Dunkley | Public Aid Eligibility Assistant | 5/10/2017 |
|---|---|---|
| EMPLOYEE'S SIGNATURE | PAYROLL TITLE | DATE |

☒ I DO NOT CONCUR (use Part V for Comments).

| Patty Ohler | LOA | 5-10-17 |
|---|---|---|
| SUPERVISOR'S SIGNATURE | PAYROLL TITLE | DATE |

☐ I HAVE PERSONALLY DISCUSSED THE CONTENT OF THIS DOCUMENT WITH THE EMPLOYEE.

| | | |
|---|---|---|
| NEXT LEVEL SUPERVISOR (REVIEW) | PAYROLL TITLE | DATE |

| | |
|---|---|
| AGENCY HEAD'S SIGNATURE | DATE |

CMS201 (Ver 6/15)

EMPLOYEE NAME:   DUNKLEY, JENNIFER

## PART VII.  QUARTERLY PROGRESS REVIEW (This can be initiated by either the employee or the supervisor.)

The employee and supervisor may meet quarterly to review progress toward previously agreed upon objectives. If the original objectives need to be adjusted, use the space below to document the change. The employee and supervisor should date and initial the document at the time of each review.

| Progress Review Dates: | Initials: | Initials: |
|---|---|---|
| 1st Quarter: | Employee: | Supervisor: |
| 2nd Quarter: | Employee: | Supervisor: |
| 3rd Quarter: | Employee: | Supervisor: |

## PART VII. Continued QUARTERLY PROGRESS REVIEW (Adjusted Objectives)

The employee and supervisor may meet quarterly to review progress toward previously agreed upon objectives. If these objectives need to be adjusted, use the space below to document these changes. This box will expand as needed.

CMS201  (Ver 6/15)

PART IV. PAEA OBJECTIVES FOR NEXT REPORTING PERIOD

I.      Promote and maintain positive customer, community, and office relations.

     A.   Assure that all visitors and coworkers are treated with dignity, courtesy, and respect.
Maintain an attitude of understanding, compassion, and sensitivity in relation to coworkers.
Be alert to special needs of persons.  Keep communication open and professional.
Participate as a Team Member to accomplish goals with excellence and efficiency.

     B.   Follow guidelines of the Employee Handbook, including a very high level of confidentiality.

     C.   Participate as requested to local office planning and work groups.

     D.   Maintain an awareness of community resource information.  Make referrals to assist
customers.

Indicators:  Observations by LOA and Co-workers

II.      Ensure accurate and timely registration of applications.

A.   Complete 100% of all registrations within 3 day time and schedule appointments within 14 days
of the application.

B.   Schedule clients for expedited services at a rate of 100% timely.

C.   Correctly complete the registration of ABE applications and route to correct queue at a rate of
100%.

D.   Correctly reschedule appointments utilizing IES calendar at a rate of 100%.

E.   Correctly scan and upload case information.

Indicators:  Random sample reviews

III.      Perform various duties timely and accurately and follow-up as required.

     A.   Accurately provide coverage at the front desk, answer phones, explain and answer general
case information for customers, complete change form, and maintain case write ups when
needed.

     B.   Process incoming and outgoing mail daily to be completed by 10:AM and 3:00PM.

     C.   Ensure Link cards are issued correctly and timely for expedited.  Appropriate supply of Link
cards is on hand at all times.

     D.   Accurately complete transfer in and out of case records within three days of receipt. Always
check to see if transfer in has previous case number for this county.

Indicators:  Valid Complaints, workers, and LOA observation.

IV.      Complete the following trainings:  Annual HIPAA Training to be documented on IL  444-4806.

V.      Supplies/Equipment/Inventory

A.   Order all office supplies in a timely manner, distribute, and organize upon receipt.

B.   Request and maintain adequate/ appropriate equipment for staff to work effectively.

C.   Maintain the office inventory by tracking the tagged equipment in the office.  Complete the annual inventory reconciliation report accurately and by the due date.



**State of Illinois**
Department of Central Management Services

**Individual Development and Performance System**

| 1. EMPLOYEE'S NAME - LAST, FIRST, MIDDLE | 2. DEPARTMENT, BOARD OR COMMISSION | 3. DIVISION OR INSTITUTION |
|---|---|---|
| DUNKLEY, JENNIFER | Department of Human Services | Family and Community Services |

| 4. EMPLOYEE'S SOCIAL SECURITY NUMBER | 5. EMPLOYEE'S PAYROLL TITLE | 6. TIME IN TITLE |
|---|---|---|
| ▮▮▮ - ▮▮ - ▮▮▮▮ | Public Aid Eligibility Assistant | 2 YRS   0 MONTHS |

**7. PERIOD OF REPORT**

From: 09/01/2016

To: 08/31/2017

**8. TYPE OF REPORT**

- ☒ ANNUAL
- ☐ QUARTERLY
- ☐ INTERIM
- ☐ FIRST PROBATIONARY
- ☐ FINAL PROBATIONARY
- ☐ SALARY INCREASE
- ☐ LAYOFF
- ☐ DISCHARGE
- ☐ OTHER (SPECIFY)

## GENERAL INFORMATION

The basic purpose of the Individual Development and Performance System is to let employees know how they are doing, to motivate them, to improve their performance and to justify administrative personnel decisions.

The system attempts to minimize subjective judgments by utilizing a work planning concept of objective setting and feedback. Thus, it helps employees control and evaluate their progress toward personal as well as organization objectives.

Central Management Services requests disclosure of information that is necessary to accomplish its obligations, primarily the statutory purposes outlined under the Personnel Code (20 ILCS 415). Social Security numbers are used in the application and employment processes to identify and differentiate between candidates and/or employees. Confidentiality of Social Security numbers obtained through this form will be preserved as prescribed by 5 ILCS 179 et seq.

The establishment of employee objectives is a five-step process which is illustrated as follows:

| Step 1 | Step 2 | Step 3 | Step 4 | Step 5 |
|---|---|---|---|---|
| **SUPERVISOR'S RESPONSIBILITY** Set and communicate appropriate objectives. → | Prepare a list of objectives with employee. Discuss work objectives for this period. → | Approve plans of action for achieving work objectives and review with higher management. → | Review progress. Make adjustments as required. Provide coaching and assistance. → | Evaluate performance and results for annual appraisal. Prepare list of objectives for next period. |
| **INFORMATION TO SHARED** Organization objectives; self-development needs. → | OBJECTIVE SETTING → | PLANS OF ACTION FOR JOB TO BE DONE → | QUARTERLY PROGRESS REVIEW → | EVALUATE PERFORMANCE ANNUALLY; RESET OBJECTIVES |
| **EMPLOYEE'S ROLE** Discuss areas of responsibility relating to objectives and self-development needs. → | Prepare list of objectives for discussion with supervisor. Discuss work objectives for this period. → | Prepare plans of action to meet objectives for approval of supervisor. Perform the job to be done. → | Review progress. Discuss any problems with supervisor. → | Make self-evaluation and evaluation results for annual appraisal. Prepare list of objectives for next period. |

Each employee will be counseled by his supervisor and a copy of this form filed in the individual's personnel folder not less than once every 12 months. Results of quarterly progress review sessions need to be recorded only on copies retained by the employee and supervisor. **A manual is available which may be obtained from the Department of Central Management Services, Bureau of Personnel.**

A minimum of three copies of this form will be prepared - one for the supervisor, one for the employee, and one for the personnel files. Additional copies may be prepared if needed. If employee's position is at a level (unskilled, etc.) that does not lend itself to objective setting, indicate by inserting "N/A" (not applicable) wherever necessary.

## REVIEW OF JOB DESCRIPTION

Review of the employee's job description is required to ensure the accuracy of the job description.
Does the job description accurately and directly relate to the objectives listed in the next part of this evaluation form?

☒ Yes   ☐ No   If No, attach a revision of the job description.

CMS201 (Ver 8/15)

EMPLOYEE NAME:  DUNKLEY, JENNIFER

| PART I.  APPRAISAL OF OBJECTIVES<br>Supervisor is to list and evaluate all objectives for which the employee was held accountable during the last reporting period.  Mark the appropriate column with an "X" for each objective.  Each box will expand as needed. | Objectives | | |
|---|---|---|---|
| | Exceeded | Met | Not Met |
| Promote and maintain positive customer, community and office relations.  Assure all visitors and coworkers are treated with dignity, courtesy and respect. | | | X |
| Ensure accurate and timely registration of all applications/redeterminations in IES and/or ACM. | | | X |
| Accurately provide coverage at front desk. | | | X |
| Process outgoing mail daily to be completed by 4:30 PM. | | | X |
| Maintain HIPPAA by protecting the privacy and confidentiality of customers and staff by ensuring completion of Netlearning training HIPAA I, II, & III, PIPA, and Administrative Directive 01.02.03.140 | | X | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

CMS201  (Ver 6/15)

EMPLOYEE NAME: _Jennifer Dunkley_

| PART II. GENERAL APPRAISAL OF EMPLOYEE PERFORMANCE | | TO BE COMPLETED BY EMPLOYEE | | | TO BE COMPLETED BY SUPERVISOR | | | |
|---|---|---|---|---|---|---|---|---|
| Complete Items 1 through 8 for all employees and Items 9 and 10 when applicable. Differences between ratings by employee and by supervisor must be discussed. | | Exceeds Expectations | Meets Expectations | Needs Improvement | Exceeds Expectations | Meets Expectations | Needs Improvement | Insufficient Opportunity to Observe |
| 1. JOB KNOWLEDGE: | Knowledge of duties and responsibilities as required for current job or position. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 2. PRODUCTIVITY: | Amount of work generated and completed successfully as compared to amount of work expected for this job or position. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 3. QUALITY: | Correctness, completeness, accuracy and economy of work - overall quality. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 4. INITIATIVE: | Self motivation - amount of work required - seeks improved methods and techniques - consistency in trying to do better. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 5. USE OF TIME: | Uses available time wisely - is punctual reporting to work - absenteeism - accomplishes required work on or ahead of schedule. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 6. PLANNING: | Sets realistic objectives - anticipates and prepares for future requirements - establishes logical priorities. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 7. FOLLOW-UP: | Maintains control of workloads - allocates resources economically - insures that assignments are completed accurately and timely. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 8. HUMAN RELATIONS: | Establishes and maintains cordial work climate - promotes harmony and enthusiasm - displays sincere interest in assisting other employees. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 9. LEADERSHIP: ☐ N/A | Sets high standards - provides good managerial example - encourages subordinates to perform efficiently - communicates effectively. | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| 10. SUBORDINATE DEVELOPMENT: ☐ N/A | Helps subordinates plan career development - trains potential replacements - gives guidance and counsel. | ○ | ● | ○ | ○ | ○ | ○ | ○ |

CMS2O1 (Ver 6/15)

EMPLOYEE NAME:  DUNKLEY, JENNIFER

| PART II.  GENERAL APPRAISAL OF EMPLOYEE PERFORMANCE | | TO BE COMPLETED BY EMPLOYEE | | | TO BE COMPLETED BY SUPERVISOR | | | |
|---|---|---|---|---|---|---|---|---|
| Complete Items 1 through 8 for all employees and Items 9 and 10 when applicable. Differences between ratings by employee and by supervisor must be discussed. | | Exceeds Expectations | Meets Expectations | Needs Improvement | Exceeds Expectations | Meets Expectations | Needs Improvement | Insufficient Opportunity to Observe |
| 1. JOB KNOWLEDGE: | Knowledge of duties and responsibilities as required for current job or position. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 2. PRODUCTIVITY: | Amount of work generated and completed successfully as compared to amount of work expected for this job or position. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 3. QUALITY: | Correctness, completeness, accuracy and economy of work - overall quality. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 4. INITIATIVE: | Self motivation - amount of work required - seeks improved methods and techniques - consistency in trying to do better. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 5. USE OF TIME: | Uses available time wisely - is punctual reporting to work - absenteeism - accomplishes required work on or ahead of schedule. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 6. PLANNING: | Sets realistic objectives - anticipates and prepares for future requirements - establishes logical priorities. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 7. FOLLOW-UP: | Maintains control of workloads - allocates resources economically - insures that assignments are completed accurately and timely. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 8. HUMAN RELATIONS: | Establishes and maintains cordial work climate - promotes harmony and enthusiasm - displays sincere interest in assisting other employees. | ○ | ● | ○ | ○ | ○ | ● | ○ |
| 9. LEADERSHIP: ☒ N/A | Sets high standards - provides good managerial example - encourages subordinates to perform efficiently - communicates effectively. | | | | | | | |
| 10. SUBORDINATE DEVELOPMENT: ☒ N/A | Helps subordinates plan career development - trains potential replacements - gives guidance and counsel. | | | | | | | |

EMPLOYEE NAME:  DUNKLEY, JENNIFER

**PART III.  REMARKS BY SUPERVISOR**
Document the ratings checked in Part I and II.

Comment on employee's outstanding achievements.  When "not met" is checked in Part I or "needs improvement" is checked in Part II, describe the reasons for this rating and what remedial steps were taken.  This box will expand as needed.

Jennifer has been a PAEA now for 2 years.  She fails to follow instructions given to her by her supervisor.  She has previously questioned the LOA when given directions to complete a task or when she has made an error.  Jennifer has previously tried to blame someone else in the office for her mistakes and takes no ownership in her mistakes.  When e-mails are sent to Jennifer in regards to instructions she does not respond to them in a timely manner if at all.  She does not answer phone calls from customers in a timely manner and sometimes doesn't answer at all.  She at times places the caller on hold and requires them to call back as does not respond timely to the caller that is on hold.  When the office associate is helping customers from the lobby or by phone Jennifer does not step in to help the other customers waiting.  She has been spoken to several times regarding verifications being placed in the proper place but continues to ignore those directions and places in incorrect drawers causing applications to not be registered timely or causing applications to be denied.  She has been spoken to numerous times about incoming mail being taken care of daily by 4:30 pm and fails to complete this task daily.  She will not answer general questions on the phone as she states it is not her job to answer questions and then the caseworkers would be dong less of their job.  She was given a copy of Receptionist Service Guide in 01/2017 so that she could answer general questions about programs and such but still fails to do that.  We have had several anonymous phone calls complaining that Jennifer is rude to them on the phone and will not answer their questions.  Jennifer has stated several times in front of other staff members that this is all a game and you just have to know how to play it.  Unless is it involves registering an application or the mail Jennifer does not want to help out in any way and staff complain that she is not a Team Player and acts as if she doesn't want to be.  I have kept all e-mail in regards to the above.

**PART IV.  EMPLOYEE OBJECTIVES FOR NEXT REPORTING PERIOD**

To be established by the supervisor with input from the employee.  Objectives should be set for each major area of job responsibility, ranked in priority order, and be as measurable as possible.  Personal development objectives may be included.  Each box will expand as needed.

See attached.

EMPLOYEE NAME:   DUNKLEY, JENNIFER

**PART V.  EMPLOYEE'S COMMENTS**

Employees may comment on all or any part of the information contained in this document, including the evaluation process.  If the employee does not concur with the evaluation, check the appropriate box in Part VI below and explain reasons for disagreement.

**PART VI.  SIGNATURES**   ☐ Check for Digital Signature Version - Uncheck for Hardcopy Signature Version

| _(signature)_ | Public Aid Eligibility Assistant | 09/15/2017 |
|---|---|---|
| EMPLOYEE'S SIGNATURE | PAYROLL TITLE | DATE |

☐  DO NOT CONCUR (use Part V for Comments).

| _(signature)_ | HSCM/LOA | 9/15/2017 |
|---|---|---|
| SUPERVISOR'S SIGNATURE | PAYROLL TITLE | DATE |

☒ I HAVE PERSONALLY DISCUSSED THE CONTENT OF THIS DOCUMENT WITH THE EMPLOYEE.

| NEXT LEVEL SUPERVISOR (REVIEW) | PAYROLL TITLE | DATE |
|---|---|---|

| AGENCY HEAD'S SIGNATURE | | DATE |
|---|---|---|

CMS201 (Ver 6/15)

EMPLOYEE NAME:   DUNKLEY, JENNIFER

**PART VII.   QUARTERLY PROGRESS REVIEW (This can be initiated by either the employee or the supervisor.)**

The employee and supervisor may meet quarterly to review progress toward previously agreed upon objectives. If the original objectives need to be adjusted, use the space below to document the change. The employee and supervisor should date and initial the document at the time of each review.

| Progress Review Dates: | Initials: | Initials: |
|---|---|---|
| 1st Quarter: | Employee: | Supervisor: |
| 2nd Quarter: | Employee: | Supervisor: |
| 3rd Quarter: | Employee: | Supervisor: |

**PART VII.   Continued QUARTERLY PROGRESS REVIEW (Adjusted Objectives)**

The employee and supervisor may meet quarterly to review progress toward previously agreed upon objectives. If these objectives need to be adjusted, use the space below to document these changes. This box will expand as needed.

Jennifer continues to not dispense mail daily by 4:30 that she agreed to, along with union rep.

Jennifer also continues to hold onto verifications for pending applications.  Sometimes for more than 2 days.  Jennifer has been previously talked to by both myself and her union rep for making copies of applications.  She continues to do that and hides them in her drawer, she prints out all of their link information after issuing their card and keeps that information.

Jennifer is unable to do the work required of a PAEA.  She has been to PAEA training 3 times and still does not know how to complete her tasks with minimal errors.  She does not know the programs of DHS and is unable to answer any questions for customers.  Jennifer refuses to learn those programs and instead states it is not her job.  She takes no initiative in her job to better herself or complete her tasks.  Staff continue to complain that she won't answer their questions in regards to something she as completed.  She usually does not even speak to them when they are talking to her.  Customers continue to complain about the rudeness they receive when speaking with her by phone or in person.

PART IV. PAEA OBJECTIVES FOR NEXT REPORTING PERIOD

I.   Promote and maintain positive customer, community, and office relations.

   A.   Assure that all visitors and coworkers are treated with dignity, courtesy, and respect.
        Maintain an attitude of understanding, compassion, and sensitivity in relation to coworkers.
        Be alert to special needs of persons.  Keep communication open and professional.
        Participate as a Team Member to accomplish goals with excellence and efficiency.
   B.   Follow guidelines of the Employee Handbook, including a very high level of confidentiality.
   C.   Participate as requested to local office planning and work groups.
   D.   Maintain an awareness of community resource information.  Make referrals to assist
        customers.

Indicators:  Observations by LOA and Co-workers

II.   Ensure accurate and timely registration of applications.

   A.   Complete 100% of all registrations within 3 day time and schedule appointments within 14 days
        of the application.
   B.   Schedule clients for expedited services at a rate of 100% timely.
   C.   Correctly complete the registration of ABE applications and route to correct queue at a rate of
        100%.
   D.   Correctly reschedule appointments utilizing IES calendar at a rate of 100%.
   E.   Correctly scan and upload case information.

Indicators:  Random sample reviews

III.   Perform various duties timely and accurately and follow-up as required.
   A.   Accurately provide coverage at the front desk, answer phones, explain and answer general
        case information for customers, complete change form, and maintain case write ups when
        needed.
   B.   Process incoming and outgoing mail daily to be completed by 10:AM and 3:00PM.
   C.   Ensure Link cards are issued correctly and timely for expedited.  Appropriate supply of Link
        cards is on hand at all times.
   D.   Accurately complete transfer in and out of case records within three days of receipt. Always
        check to see if transfer in has previous case number for this county.

Indicators:  Valid Complaints, workers, and LOA observation.

IV.   Complete the following trainings:  Annual HIPAA Training to be documented on IL 444-4806.
V.    Supplies/Equipment/Inventory

A.   Order all office supplies in a timely manner, distribute, and organize upon receipt.
B.   Request and maintain adequate/ appropriate equipment for staff to work effectively.
C.   Maintain the office inventory by tracking the tagged equipment in the office.  Complete the annual inventory reconciliation report accurately and by the due date.

ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES
CLASS SPECIFICATION

PUBLIC AID ELIGIBILITY ASSISTANT

POSITION CODE: 35825
Effective: 06/01/2015

DISTINGUISHING FEATURES OF WORK:

Under direct supervision, receives public assistance clients who have intake or return appointments with caseworkers, greets persons applying for public assistance programs, obtains initial necessary information and explains available programs to applicants and/or screens new applicants for public assistance and sets up eligibility appointments with the intake specialist or performs the verification function in an intake unit; performs clerical duties as required.

In Class I and Class II county offices: this class specification is intended to include one clerk who does screening; for additional support clerks to be included, all must screen applicants at least 25% of the time. In all other circumstances 50% or more of the time should be spent on intake or return appointments or screening or verifying.

ILLUSTRATIVE EXAMPLES OF WORK:

1.  Greets clients and new applicants for public assistance; asks name and address and keyboards the answers on the menu screen using a computer; informs appropriate caseworker that the person has arrived for their appointment; requests that new applicants be seated and wait until a screener is available to help them apply for public assistance; discusses general eligibility factors and benefits of public assistance programs.

2.  Screens applicants and assists them in applying for public assistance; completes appropriate screening menu by asking applicant questions from the appropriate menu screen and by entering applicant's answers using the computer; prints out a copy of information entered, asks applicant to read information on printout and if it is correct, to sign their name; schedules a return appointment with the intake specialist who will determine public assistance eligibility; advises which documents the applicant should bring for this interview.

3.  Performs the verification function in an intake unit; reviews various public records to determine birth dates, school attendance and income; conducts home and collateral visits to verify pertinent facts at the point of intake; prepares necessary records and reports for use of the eligibility specialist.

4.  Enters initial and updated technical, client and office information into all public aid data entry systems.

2

PUBLIC AID ELIGIBILITY ASSISTANT (Continued)

5.   Keyboards a variety of material from diverse sources when assigned to a small county office, including statistical, numerical or technical data, charts, exhibits and simple material, designing new formats, if necessary; keyboards and composes varied correspondence which requires the use of independent judgment and command of business terminology to clearly present complex ideas, and which may receive only spot checking before release to other departments or the general public; checks for accuracy and correctness of spelling, grammar and punctuation; signs supervisor's name to correspondence as authorized; receives, sorts, opens, reads and distributes mail, official letters and other incoming correspondence; either assembles and mails, or directs the completion of these duties by other clerical personnel, of materials and outgoing correspondence; coordinates clerical and minor administrative functions of a small local office.

6.   Attends training and update sessions on Healthcare and Family Services policies, procedures and regulations.

7.   Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above.

DESIRABLE REQUIREMENTS:

Education and Experience
      Requires knowledge, skill and mental development equivalent to the completion of high school and requires one year of clerical supportive experience in the Department of Healthcare and Family Services or equivalent training and experience.
      Requires written and spoken knowledge of the English language and may require the ability to speak and write a foreign language, such as Spanish at the colloquial skill level in order to communicate with non-English speaking persons.

Knowledge, Skills and Abilities
      Requires working knowledge of business English, arithmetic and modern office practices and procedures.
      Requires working knowledge of a public assistance program.
      Requires the ability to establish and maintain satisfactory working relationships with public assistance clients, the general public and other employees.
      Requires the ability to keyboard accurately at a working rate of speed.
      Requires the ability to make arithmetic computations, rapidly and accurately.
      Requires the ability to understand and follow complex oral or written instructions.
      Requires the ability to prepare and keyboard complex statements and reports when assigned to a small county office.
      Requires the ability to organize, layout, develop and install clerical forms and procedures when assigned to a small county office.

<div align="center">**Statement in response to the evaluation**</div>

**May 10th**        **10:00 am   Meeting**          **Jennifer Dunkley**

### In 2106

We had an Office Assistant (Tara) she worked the front desk. She did not do the mail. The LOA (JS) did the mail in her office. A caseworker sat at the customer service desk. I worked from my office, doing new applications, answering phones, and scanning, and registering REDE apps that come in the mail each day. I covered the office assistant breaks and lunch at the front desk.

### November 2016

The Office Assistant leaves the job. A caseworker still sits at the customer service desk, this caseworker also registers the walk in snap REDE apps. Now I work the front desk, but I still use my office to catch up with PAEA work during my breaks and lunch time. I am doing 2 people's job, the office Assistant and the PAEA. I am still required to process new application, and registering REDE apps that come in the mail each day. I also screen for expedited applications and expedited snap REDES, A situation arose in the office where case workers were processing REDE cases and forgetting to register the app, so I was told that I need to register every snap REDE walk in application before giving it to the caseworker.

### January 2017 – March 2017

The LOA (JS) is retired. In addition to working the front desk, registering new applications, registering REDE applications that come in the mail each day and register every REDE walk-in application, I was told that doing the mail is a front desk task, so I now also do the mail each day. In addition, I am told that I am responsible to transfer cases also. I am also responsible for scanning and uploading.

### April 2017 – Current

A new Office Assistant is hired, who I trained in three weeks. About an hour into her 1st day on the job she was brought to the front desk and left with me. She works the front desk but she does not do the mail because she was told by Patty. H not to do it.

I have been moved out of my office to sit at the desk that the customer service case worker usually sits. The previous complaints of caseworkers who worked that wrap was that they could not get any work done sitting at that desk because of the interruptions of the phones and walk in customers.

While sitting at the customer service desk, I answer the phones, see walk-ins, cover the office assistant lunch and breaks, register new applications-IES and paper, register REDE's that come in the mail, register walk-in REDE applications, transfer cases, process link cards, and do the mail. It is also my responsibility to keep up with the scanning folder, uploading, scanning, and moving files. In addition to screening for expedited application and REDES, I am told to send an email to notify the caseworker whenever I put an expedited item in their mailbox or IES expedited queue.

The task of doing the mail involves….

1. Opening all the mail and date stamping.
2. Sorting (MPR, REDEs, NEW APPLICATIONS, Paystubs, notes etc.)
3. I also scan and upload IES verifications that come in the mail.

4. Items that come in without a 267 attached need to be research on the computer, in Seagull to find the case number, and then in Wingrape to see the case notes to find where they belong.
5. There is also a need to go to the cabinets to find matching documents for verifications.
6. When customers send in the actual paystubs, birth certificate, life insurance policies, Medicare cards etc. These items have to be photocopied and the original item mailed to the customer.
7. When items come in and there is no match, there is no place to put it so I usually scan the document.
8. After sorting the mail I also register the snap REDE's and new applications that came in the mail.
9. Some days there are over 50 items that come in the mail, and some days 15 or less items.

I am experiencing the same challenges of the customer service caseworker who used to sit at the customer service desk that I am currently sitting at all day.  The constant interruptions all the time makes it very problematic to complete tasks.

I have spoken to Patty Herker about this and asked to be allowed time away from the front to complete the mail each day and she said no.

As a PAEA in the Montgomery County FCRC, I feel that I am being mistreated by Patty Herker, LOA. I have observed other PAEA's in different FCRC's (when I have been on training) and they are not required to work under these conditions. The PAEA's in other FCRC usually work in their own space away from the front desk where they can concentrate on processing their applications correctly and completing other tasks properly.

I am being treated unfairly by Patty Herker (LOA), in that she goes through my recycle bin when I am not at work and retrieves items to keep in her office as evidence. She does not do this to other workers. She removes work that I leave on my desk for the next day and keeps it as evidence, without returning it so that I cannot complete my work. I am questioned for having work incomplete that may be 1-2 days old. She does not do this to other workers. This is unfair because other workers also have incomplete work but their work are not removed as evidence. There have been changes in the change draw over 30 days old but they are not removed and kept as evidence against the worker who has that task on their wrap. When other workers make a mistake like forgetting to register REDE's and it is not realized until a week or so later, these errors are taken care of without a trace.

I am deliberately being targeted by Patty Herker. She has been the Montgomery County FCRC LOA for less than six weeks and she has made a calculating effort to collect my work and look for errors in order to smear my career at DHS.

My previous evaluations have been good. I am good worker and I want to do a good job. I also want to be treated fairly in the workplace.

As a PAEA in the DHS working in Montgomery County, I am not treated equally as the other PAEA's who work for the DHS.

In regards to the various tasks involved in my job position, I am requesting 3 hours each day (preferably in the afternoon 2pm -5pm) away the front of the office so that I can focus on doing the mail and also new applications more efficiently.

On 5/12/2017 I sent you an e-mail regarding a LINK card that had not been issued yet. The customer was issued expedited and the date of the LINK form 3658 was dated 5/6/2017. On 5/11/2017 the 3658 was pulled out of the LINK folder and was placed in your mailbox to issue. You were asked to make sure LINK cards are issued timely as these customers have been issued expedited snap and therefore it needs to be issued in a timely manner. The response I received is it is not true and that all LINK cards had been issued before leaving on 5/11/2017. The 3658 was pulled from the folder on 5/11/2017 as it should have been issued on 5/8/2017 and mailed to the customer as requested. Again the response I get is that is was not there and Thanks! This is not the first time that you have had to be told to make sure LINK cards were issued timely.

It is your responsibility to maintain the LINK folder and issue LINK cards in a timely manner everyday. I don't expect to be talked back to when I ask for something to be done. When I e-mail you it is for instructions and responsibilities and responses are to be worded in a way that you are not sound insubordinate.

Patty Diler 5/15/17
Jennifer Dunkley 5/15/17

Statement in Response to Counseling on 5/15/17

This statement is a response to the accusation by Patty Herker, LOA that an expedited link issuances form was in the LINK folder in my mail box and that I did not issue the link card in a timely manner.

The particular link issuance form in question was not in my link folder or my mailbox before the morning of May 12th because prior to that day I had consistently worked on every form that was in the LINK folder or my mailbox. I had regularly issued link cards out of the link folder and checked my mailbox daily all week. In particular, I issued link cards on the 4th, 5th, 8th, 9th, 10th and 11th of May. When I left work on May 11 they were no link issuance forms in my LINK folder or mail box.

On the morning of May 12th, I noticed that there was a link issuance form in my mailbox, I took it out and worked on issuing the card. At the time Patty H. (LOA) and Becky M. were at the front of the office. As I worked on issuing the card I noticed that it seemed that it was being issued from a case that was being transferred. I asked Patty H. about it and her response was something to the effect of "who would do that'. The conversation did not go any further because there was a customer to attend who required my attention.

It was only after this that I noticed that Patty Herker, LOA had sent an email to me about the link issuance form stating that it was an expedited card and that the form was in my box from the 6th of May. It was then that I responded to her email about the fact that I had worked on LINK cards on May 11th and there were no forms left to be issued from my mailbox when I left that day. Patty Herker, LOA responded that form was pulled from my link folder on May 11th. I find this puzzling, because if there is an expedited LINK issuance from in my mailbox from May 6th, and someone notices it on May 11th, it should have been brought to my attention immediately on the 11th when it was discovered so that I could issue the expedited card as soon as possible. I do not understand why the link issuance form was removed from my mailbox on the 11th as stated by Patty Herker, LOA in her email. I also do not understand why this was not brought to my attention immediately on the same day. I also wonder if this is a this a common practice that a link issuance form could be printed at an earlier date and then removed from my mail box only to be then returned to my mail box at a later date.

I would like to request that, in the future, if an expedited LINK card issuance form is placed in the LINK folder or my mail box, for the caseworker to kindly send me an email to notify me. This is a courtesy that I have been asked to use in regards to expedited REDE's and applications, to send an email to the caseworker to let them know that they are in the queue or in the mailbox, and I have been following through with that suggestion.

Thank you for your consideration.

Jennifer Dunkley



**Bruce Rauner,** *Governor*        Illinois Department of Human Services        **James T. Dimas,** *Secretary*

MEMORANDUM

DATE:   6/19/2017
TO:     Jennifer Dunkley
FROM:   Patty Herker
RE:     Pre-disciplinary action meeting

This is a pre-disciplinary meeting which I am conducting in compliance with the collective
bargaining agreement. I am contemplating disciplinary action against you for
insubordination, failure to do your job, and poor job performance. My reasons for this are
you continue to register applications with the incorrect dates, failure to respond to e-mails
timely, responding to e-mail with insubordinate responses, not following the agreements of
mail being distributed daily by 4:30pm(which you agreed to). I am providing you with
documentation of these charges. If you wish, you may rebut these charges at this time.

*Patty Herker HSCM/LOA  6/19/17*

Pre-Disciplinary rebuttal

Jennifer Dunkley

6/26/2017

This rebuttal is a response to the pre-disciplinary action meeting on 6/19/2017. You will see clearly that the working conditions in Montgomery County FCRC violates Title VII.

*"It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Title VII, Civil Rights Act of 1964*

**Mail**

I have been told by PH that when I have a lot of work that I think I may not complete I should let her know and ask for help. However when I have asked for help, I was chastised instead of receiving support.

On June 12th I advise PH (Local Office Administrator) by email that there was a lot of mail and I was having difficulty completing the task because CM (Office Associate) was training with BM (Caseworker) to do the payroll. PH response was that I needed to sort it out and get it done by 4:30 pm.

One of the challenges of doing the mail are the verifications, such as paystubs which cannot be matched to any paperwork in the office. Given the fact that the mail is not the only task I do in the day I am limited in the amount of time that I can spend searching for matching paperwork which may have been filed or placed on various caseworkers' desks. So, this leaves the problem of where should the verifications which are unfound go so that they are accessible. I usually scan items into the scanning folder, but a case could be denied if a caseworker does not check that folder before denying.

At one point, before I started to do the mail there was a folder in the 267 cabinet titled "Unfound verifications". The practice was that verifications that came in by mail or fax and could not be matched were placed in this folder. The caseworkers knew that if they were waiting for verifications, this was a place to look. This practice had been happening before I started in 2015.

When PH became LOA she told me not to put any verifications in this folder, I asked her what I should do with the unfound verification.   Her response was "find them". PH then removed the folder from the cabinet, hence creating this situation of not having a place to put verifications that are unmatched.

I have been written up and reprimanded for having unfound items at the end of the day, when other staff who were also in the same situation have not been reprimanded.

On one occasion when CM (Office Associate) did the mail she placed the unfound mail on the central table where the caseworkers pass by and they looked through the items and picked out the verification they needed for items that were probably on their desk. The next day when I did the mail and placed the unfound items on the same table I was written up by PH for carelessly leaving the mail on the table. CM (Office Associate) was not reprimanded in any way.

### Insubordination

I have endeavored to be respectful in my communications with PH (Local Office Administrator). However, I may have expressed some frustration in one email communication with PH, which during our meeting she expressed that it offended her and I apologized to her. The situation in this email arose because I was helping one of the new employees and another employee told PH about it. I was then sent an email by PH telling me not to train the new employees. In my email reply I explained to PH that I was asked a question by one of the new employees and I was only attempting to answer the question and I ended the email with "you're welcome".

My frustration in this situation is that even though I trained the Office Associate I have been accused by PH in my evaluation of not being a team player. I am told not to help the new employees; she has not said this to any other employee.

I have endeavored to follow the policies and instructions given by PH (LOA). However there are extenuating circumstances that call for flexibility in the work environment. One of these circumstance involve leaving for break in a timely manner. My Public Aid Eligibility Assistant position involves answering the phone and serving customers in the front lobby. I have always tried to be sensitive to the needs of the customer. In a situation where the Office Assistant returns from her break and I am on the telephone with a customer I will need to finish the conversation and make sure that I am giving good customer service. Another situation may be that someone had been waiting at my window while I was on a call, instead of telling them to go to the other window it may be more polite to serve them and then go on my break.

Another circumstance that prevents me from leaving for my lunch break at exactly 1:00 is that when the lunch hour is busy and there are a lot of people in the lobby I need to let the Office Associate know who is in the lobby and why they are there and whose queue they have been put. Sometimes when I'm on the phone and the Office Associate comes back she may answer another call on the phone, so I would need to wait for her to finish her call so that I can tell her about our customers in the lobby. I have found that this is an easy way to prevent confusion and unnecessary long waits for our customers.

If the Office Associate knows whose queue I have put a customer in and they have waited for more than fifteen minutes she can call that particular caseworker to see if her VIS is up, sometimes the caseworker may forget to put their VIS up after break or lunch. This practice of having a good hand off has help thing run smoothly at the front of the office. There are times

when a customer may have come in with information for particular case workers and I may not have had the time to send an email so I may I try to talk to the caseworker before I leave for lunch so that they know what's happening.

Another extenuating circumstance is that when it is very busy and I have a lot of customers, turning verifications, I find it hard in good conscience to leave confidential paperwork strewn all over my desk. I do not have an office and my desk is near the lobby window in open view. So I usually try to take a few minutes and put away my paperwork in an orderly way.

I have explained to PH the reasons why on some days leaving at the exact times are more difficult but she has refused to give me any flexibility.

I am treated differently by PH in regards to the break schedule because other employees have flexibility when taking their breaks and they are not written up or disciplined in regard to their breaks even though they may leave late, take extra time or just have their breaks in their office. There are no repercussions for them.

I have not been insubordinate towards PH (Local Office Administrator).

**Job Performance**

I have been written up and reprimanded for having unfound items at the end of the day, when other staff who were also in the same situation have not been reprimanded.

On one occasion when CM (Office Associate) did the mail she placed the unfound mail on the central table where the caseworkers pass by and they looked through the items and picked out the verification they needed for items that were probably on their desk. The next day when I did the mail and placed the unfound items on the same table I was written up by PH for carelessly leaving the mail on the table. CM (Office Associate) was not reprimanded in any way.

On Monday, June 19th I was feeling sick so I went home. So the mail for June 19th was opened and distributed by CB (Caseworker). It came to my attention that on Tuesday June 20th, she was still trying to find out where some pieces of mail should go so she came to ask CM (Office Associate) and I (PAEA) what to do with the paystubs. On Wednesday, June 21st, another caseworker (EL) came to me with paystubs from the June 19th mail, she said CB had given them to her to try to find the matching paperwork.

CB (caseworker) was not reprimanded for having mail undistributed for two days, however PH takes work for my desk in the mornings and checks it, and if I have verifications from the day before, I am written up. She does not do this to anyone else in the office.

If I am performing poorly in this task of opening and distributing mail it is because the problem was created by PH (Local Office Administrator). Both CB (Office Assistant) and I have explained

to her the need of solution to this problem or to go back to having the folder for "Unfound verification" again but she has not done anything about it.

**Errors**

PH has been targeting every work that I touch; additionally she also has other staff reporting to her about my work. If an article of mail is placed in the wrong cabinet draw, other staff are advised take it to her so that she can write it up. Recently we have been required to put our initials on the change forms that we take from customers by the telephone and in person. PH (Local Office administrator) and other staff have been putting my name or my title in the 514 case write ups.

See attached case 94-076-22-FA5189 write up and case 96-076-22-033451 write up.

A mistake happened in case 96-076-22-033451 because it was break time and I was trying to leave for my break on time so we did not have a good hand over. The way I remember it is that CM (Office Associate) and EL (Social Services Caseworker Trainee) came back from their break at 10:15 am. A customer came to the window with a REDE form, she was logged into VIS at 10:18 am on 6/13, I believe CM mentioned that it was an expedite REDE so it should go to CB (Caseworker), however, EL volunteered to do the interview saying she would give the REDE application to CB to process afterwards. So I quickly registered the REDE and went on my break. At some point instead of this REDE application going to CB to be processed as an expedited REDE it was put in the ready to process draw and was not retrieved until the customer called seven days later. In the write up PH (Local Office Administrator) faults me for not flagging the case as expedited. If I had taken more time and not rush off to my break, I would have sent it to CB who is dong expedited cases, a few more minutes to think it through would have led to better decision making by all three of us.

In registering applications it is important to use the correct dates. I work very hard to be careful in doing this correctly, however, sometimes I make a mistake by using a wrong date, for example an application came in on 6/10 and I am registering it on 6/11. I may inadvertently use 6/11 as the registration date when it should be 6/10. When this happens other staff will take these applications to PH (Local Office Administrator) I am then written up and reprimanded for these errors. The reality is that it would take less than a minute for me to correct this kind of mistake but I am not given the opportunity to make corrections without reprimand.

Other employees make errors all the time but they are given the opportunity to correct them without consequences.

Examples are:

94-076-22-034441(BF) this is an expedite case. In the 514 it states it is an expedited case, however, the caseworker did not code it for expedite on page 4 in seagull. The customer

originally came to the office on 6/16/17.  Six days later on 6/22/2107 she called to say she was promised a link card in 3 days and she had not receive it. The REDE application was still in the ready to process draw. After checking with a caseworker (PA) I issued a link card in the office for the customer.

Case 94-076- 22- fa5940 (SP) On 6/2 a customer brought in verification, her REDE was in the ready to process draw, it is stamped received 6/15. However, there was no registration page attached to show that this REDE was registered. I checked page 4 in seagull and there was no registration recorded. I sent an email to PH to let her know and I put the application in her mail box. She has not responded to my email.

These kinds of errors put us out of compliance, however, the employees responsible for these errors were not written up or reprimanded. Instead an email was sent out by PH advising all the staff one to be more careful with expedited applications. (Email attached)

**Breaks and Lunch hour**

My assigned break 10:15 am and 3: 15 pm and lunch break is 1: 00 pm, during breaks I am usually the only one left manning the office, at lunch time there is usually one case worker who is at their desk.

The practice in this office has been that employees make effort to go to their breaks and lunch on time, however there were many times when employees would leave late for breaks or lunch. The practice was that they would tell me or CB (Office Associate) that they were leaving late and what time they would be back. The reason they would tell us is that we are the ones queueing the customers to caseworkers.

PH started to target the time that I would leave for breaks and lunch, saying that I had to leave exactly on time. This rule is only for me because no one else was asked to do that.

When I would leave about 10 minutes late for my break other employees who took first break would still be on their break sitting in the break room of just coming back from their walk. This means that either they left late for their breaks or they took extra time.

On June 20th I went for my morning break at 10:25 and was sitting outside on the bench. At about 10:30 am another employee PA (caseworker) was leaving for her break to go to the store. As I stated before the rules that PH (Local Office Administrator) has are only for me. On 5/31 it was a busy lunch time and I was trying to handover and clear some verifications from my desk that had come in.  I also had some messages for BM (caseworker), who had not come back from lunch until 1: 30 because she left late. I gave her the messages and went for lunch. PH only reprimanded me for leaving late and made no mention that this caseworker was late also. BM was also late coming back from lunch on the day before. This has been a regular practice in this office where there was flexibility for everyone but PH has decided to target me.

Most of the time even if I leave late for 1:00 pm lunch break I still return by 2 pm.

Other employees have the freedom of flexibility in their break schedule in they they are not watched and required to go at the exact minute. They have opportunities to correct their errors without them being written up in evaluations, counseling, reprimands and disciplinary meetings. I, on the other hand have not been extended these privileges by PH (LOA).



**Bruce Rauner,** *Governor*

**Illinois Department of Human Services**

**James T. Dimas,** *Secretary*

DATE:   6/27/2017

TO:     Jennifer Dunkley

FROM:  Patty Herker

RE:     Recommendation for 5 Day Suspension for Insubordination, Poor Job Performance, and Failure to do your job.

Following a pre-disciplinary meeting held on 6/19/2017 at which you were represented by AFSCME Local 2600 representative Lisa Eden, and after having read and considered your rebuttal in which you took no responsibility or ownership in your actions, I have determined that corrective disciplinary action is necessary. Consequently, I am recommending that you be suspended for a period of 5 business days. This suspension shall commence on 7/03/2017 and end on 7/10/2017. You will return to work on 7/11/2017 at 8:30 AM.

Specifically, you are being disciplined for your insubordination and poor job performance. Your actions, failure to follow directives given by the LOA, failure to respond to directives from the LOA, failure to register and screen applications correctly in which customers are then not receiving the correct amount of benefits and not receiving benefits for expedited timely, failure to complete daily tasks (specifically mail and verifications) in a timely manner which was agreed upon with you during interim evaluation on 5/10/2017, counseling on 5/15/2017 and 6/19/2017, and oral reprimand on 6/5/2017. Be advised that further incidents of this nature will result in more severe disciplinary action up to and including discharge.

Cc  Patty Herker
    Diane Campbell
    Personnel Office/Annette Tonjes
    ASCME Local 2600
    Union Steward/Lisa Eden

**Dunkley, Jennifer**

| | |
|---|---|
| **From:** | Eden, Lisa   DDS Springfield IL <Lisa.Eden@ssa.gov> |
| **Sent:** | Thursday, June 29, 2017 12:28 PM |
| **To:** | Dunkley, Jennifer |
| **Cc:** | AFSCME LOCAL 2600 (local2600@sbcglobal.net); Hoyle, Melanie |
| **Subject:** | [External] RE: Corrective Discipline from Pre-D meeting |

I am filing grievance number 628658 on your behalf for Managements failure to follow progressive and corrective discipline.

This is a violation of Article IX – Discipline, Section 1.  The Employer agrees with the tenets of progressive and corrective discipline. Disciplinary action or measures shall include only the following:
a) Oral reprimand;
b) Written reprimand;
c) Suspension (notice to be given in writing); and
d) Discharge (notice to be given in writing).

While the grievance is pending, you must serve your suspension.  You cannot be on state property during your suspension.  If you do, it is considered trespassing.

I will keep you updated on the progress of your grievance.

*Lisa Eden*
*Contract Administrator/Telecom Coordinator*
*AFSCME Local 2600*
*Union Steward and Membership Chair*
*Department of Human Services*
*Division of Rehabilitation Services*
*Bureau of Disability Determination Services*
*100 North 1st Street*
*Springfield, IL 62702*
Lisa.Eden@SSA.gov
Lisa.Eden@Illinois.gov
*217/782-4367 - Office*
*217/782-3936 - Fax*

---

**From:** Herker, Patty [mailto:Patty.Herker@illinois.gov]
**Sent:** Wednesday, June 28, 2017 1:37 PM
**To:** Dunkley, Jennifer
**Cc:** AFSCME LOCAL 2600 (local2600@sbcglobal.net); Eden, Lisa DDS Springfield IL; Hoyle, Melanie; Campbell, Diane R.; Starr, Richard; Tonjes, Annette
**Subject:** Corrective Discipline from Pre-D meeting
**Importance:** High

Jennifer,
Attached is my decision for corrective discipline from our Pre-Disciplinary Meeting held 6/19/2017.

*Patty Herker, HSCM/LOA*
*Montgomery County FCRC*

1



Bruce Rauner, *Governor*          Illinois Department of Human Services          James T. Dimas, *Secretary*

DATE:    7/11/2017
TO:      Jennifer Dunkley
FROM:    Patty Herker
RE:      Pre-disciplinary action meeting

This is a pre-disciplinary meeting which I am conducting in compliance with the collective Bargaining agreement. I am contemplating disciplinary action against you for Insubordination, failure to do your job, and poor job performance. My reasons for this is your continuous failure to follow procedures and directives in registering and screening applications for possible expedited. You continue to ignore LOA's directives in regards to job duties and lunch period that has been assigned. I am providing you with documentation of these charges. If you wish, you may rebut these charges at this time or provide your response by close of business on 7/18/2017.

*Patty Herker* 7/11/17 @ 9:55AM

7/13/2017

Rebuttal to the Pre-disciplinary meeting on 7/11/2017

Re: KS 94-115-22-FF8430

The customer had a pending application in another county. I did not register the paper application that was faxed to our office because I had previously been instructed not to register duplicate applications.

Re: LL 94-076-34442

During customer intake and screening I transfer and register applications. I believe that I verbally communicated that the application may be potentially expedited. I don't fully remember this particular case. The information that I gain is usually surface information. Caseworkers do in-depth interviews to unearth the true situation. There are times when a customer may seem to have an expedited case but during the interview the truth comes out, and vice versa. The responsibility of this application being out of compliance cannot be solely placed on me seeing the casework would have had more time with the customer.

Re: TS 6-076-33451

I don't fully remember this case as I was about to go on break but I think this was due to a miscommunication among the caseworkers involved and the clerical staff.

Re: Link cards issuance

I have had request from caseworkers to issue link cards for cases which are cancelled and also not activated in the system. In these situation I refer the case back to the caseworker. In cases where the item batched the caseworker works on it and then returns the request for issuance. I cannot control the timeline in which this happens.

In conclusion, the common theme of this pre-disciplinary meeting is to target and unfairly accuse me of inadequacies in regards to my job performance. I have observed that in other situations when a customer calls and an expedited link card is out of compliance, depending on who is responsible, it is handled differently. For example AC 94-076-22-fa7351 called to say she was promised her card would be ready in two days but it was not. PH (LOA) was notified, after inquiry it was found that BM had worked on the case, at this point PH (LOA) said the case was reassessed to determine that it is not an expedite case for some reason that puts the blame on the customer and their right to expedite is forfeited. Hence there was no error because the case was not an expedited case. This seem to be a common practice to avoid being out of compliance and a way to protect Patricia Herker's (LOA) friends.

Patricia Herker (LOA) is retaliating and has continued to exercise unfair and discriminatory practices towards me.

Jennifer Dunkley                    7/13/2017

| PRINTED | 01 | ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES | 02 | |
|---|---|---|---|---|
| 08/03/2017 | | PERSONNEL/POSITION ACTION FORM | SS # | 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 |

## EMPLOYEE INFORMATION

| | 03 | | | 04 | 05 | 06 | 07 | 7A | 08 | |
|---|---|---|---|---|---|---|---|---|---|---|
| LAST NAME | | FIRST | | INIT | SEX | RACE | VET | EDUC | TIER 1/2 | DATE OF BIRTH |
| DUNKLEY | | JENNIFER | | A | F | B | N | 6 | 1 | 01/04/1982 |
| DUNKLEY | | JENNIFER | | A | F | B | N | 6 | 1 | 01/04/1982 |

| 09 | 10 | 11 | 12 | 13 | 13A |
|---|---|---|---|---|---|
| STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE | NAY ORIG |
| 108 S SPRUCE ST. | GREENVILLE | 003 | IL | 62246 | 000 |
| 108 S SPRUCE ST. | GREENVILLE | 003 | IL | 62246 | 000 |

| 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | | 22 | 22A | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PAY PLAN | PAY GRADE | PAY STEP | SALARY | PAY RATE | FULL/PT TIME | FUNDING | PAYROLL DEPT. | CODE APPROP. | CORRECTED SOCIAL SECURITY NO. | BARGAINING UNIT CODE | PERF. CODE |
| B | 00 | 1C | $ 2,935.00 | M | F | 00 | 10 | 110 | | RC-028 | |
| B | 00 | 1C | $ 2,935.00 | M | F | | 10 | 110 | | RC-028 | |

| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 29A |
|---|---|---|---|---|---|---|---|
| CONTINUOUS SERVICE DATE | SENIORITY/DATE | CREDITABLE SERVICE DATE | APPT. EXPIRATION DATE | STATUS | SUSPENSION/LOA RETURN DATE | APPT. REQ. NO. | DISABILITY |
| 09/01/2015 | 09/01/2015 | 09/01/2015 | | A | | | |
| 09/01/2015 | 09/01/2015 | 09/01/2015 | | A | 08/14/2017 | | |

## POSITION INFORMATION

| | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
|---|---|---|---|---|---|---|---|
| POSITION TITLE (NAME) | | POSITION NUMBER | EXMT CODE | WORK COUNTY | AV AUTH | AUDIT | POS DES COMP |
| PUB AID ELIGIBILITY ASST | | 35825-10-94-076-00-01 | 0 | 068 | | | |
| PUB AID ELIGIBILITY ASST | | 35825-10-94-076-00-01 | | 068 | | | |

## TRANSACTION INFORMATION

| | | 37 | 38 | 39 | 40 |
|---|---|---|---|---|---|
| | | TRANSACTION NAME | TRANS CODE | EFFECTIVE DATE | PRIOR ITY |
| LAST TRANS | 1 | | | | |
| | 2 | | | | |
| | 3 | | | | |
| | 4 | | | | |
| THIS TRANS | 1 | Suspension 30 Days or Less | BA082 | 08/07/2017 | 0 |
| | 2 | RETURN FROM SUSPENSION | BA085 | 08/14/2017 | 0 |
| | 3 | | | | |
| | 4 | | | | |

### CODES

**STATUS**
A-CERTIFIED
B-PROB. 4 MOS
C-PROB. 6 MOS
D-PROVISIONAL
E-3 MONTH CERT
F-EXEMPT
G-TEMPORARY
H-EMERGENCY
I-6 MONTH CERT
J-TRAINEE
K-TRAINEE
L-TRAINEE
M-9 MONTH CERT
N-12 MONTH CERT
O-137 DAYS
P-18 MONTH (UNP)
Q-INTERIM ASSIGN

**EXEMPT**
D-NOT EXEMPT
1-PRIVATE SECRETARY
2-ADMINISTRATIVE HEAD
3-POLICY MAKER
4-UNSKILLED
5-LIC. ATTORNEY
6-OUT OF STATE
7-TECH ADVISR W/O COMM
8-PARTIAL EXEMPTION
8-PARTIAL EXMPT BY

## REMARKS

SEVEN (7) DAY SUSPENSION-08/07/17 - 08/13/17 (08/12-08/13/17-REG DAY OFF) - RETURN: 08/14/2017

CHARGES: Failure to Follow Supervisory Instructions/Failure to Perform Duties (See attached)

PRE-D: 07-24-17 / PREV DISC: 05/15/17 - Counseling; 06/05/17 - Oral Reprimand; - 06/19/17 - Counseling; - 07/03/17 - 5 Day Susp

| EMPLOYEE SIGNATURE (REQUIRED ON VOLUNTARY ACTION) | DATE | AGENCY APPROVAL (OPTIONAL) | | DATE |
|---|---|---|---|---|
| SIGNATURE OF PERSON SERVING SUB/DISC | 8/7/17 DATE | AGENCY BUDGETARY (OPTIONAL) | | DATE |
| BY MAIL ☐ IN PERSON ☐ | | | | |
| DIRECTOR OF CENTRAL MANAGEMENT SERVICES | DATE | AGENCY HEAD APPROVAL | 8/11/17 | DATE |

August A

12



**Bruce Rauner,** *Governor*

Illinois Department of Human Services

*2017*
*8/24/17*

**James T. Dimas,** *Secretary*

## INTEROFFICE MEMO

DATE:     08/11/2017
TO:       JENNIFER DUNKLEY
FROM:     PATTY HERKER
SUBJECT:  PRE-DISCIPLINARY MEETING

I have scheduled a pre-disciplinary meeting for Thursday, August 17, 2017 at 10:00 AM. You have a right to be represented by the Union at the meeting. If you so choose to be represented you may contact them or I can.

Problems that will be discussed are non- compliance with timely application registration and expedited screening of applications. Copying of customers private information and keeping instead of shredding per discussion in April 2017 you were told this is a HIPPA violation. Failure to follow directives from the LOA and insubordination that have been discussed during interim evaluation, counseling, previous Pre-Disciplinary meeting and oral reprimand.

*Patty Herker 8/17/17*
*Jennifer Dunkley*

Cc: LOA
    AFSCME Representative: Lisa Eden
    RICHARD STARR

August 23, 2017

**Rebuttal to 8/17/2017 Pre- Disciplinary Meeting**

**The charges discussed were as follows:**

**Non- compliance with timely application registration and expedited screening of applications.**

**In regards to expedited screening of applications I prefer to err on the side of caution.**

Patricia Herker, LOA has said that I am wasting the caseworkers time by tagging an application as possible expedite.  P.H said that if I put possible expedite on an application and the application turns out not to be expedited I would have wasted the caseworkers time. I have explained to her that based on the information written on the application it may seem to be an expedited case but when the caseworker does the interview they will know if it is truly an expedite case because customers give more information during the interview.

(An email regarding this is in the attachment **A**)

**In regards to registering of applications, I have been registering applications in a timely manner.**

There have been situations where Patricia Herker, LOA has claimed I did not register an application in a timely manner, however, these claims were shown to be falsification by Patricia Herker, LOA

**Case 1**

On July 27th Patricia Herker documented falsely in an email that I had left an application dated 7/24 in the IES inbox.

On the IES system the applications are in the inbox, anyone who has access to log in to IES can register an application if they know how to do it, however if someone starts the process of registering an IES application and fails to complete it, that application no longer shows in the IES inbox but it will show on that individuals log in as an application in progress. On 7/26 and 7/27 this application was only in Patricia's Herker's IES inbox, it was not showing in mine.

The application came in on 7/24 and it was not registered until 7/27. Patricia Herker, LOA started this application on 7/25 or 7/26 but she did not complete it until 7/27.

(The email is in the attachment **B**)

**Case 2**

On August 16th Patricia Herker, LOA documented falsely in an email that I had registered a 114 days old application.

(The email is in the attachment **C**)


**Coping of customer's private information and keeping instead of shredding per discussion in April 2017, you stated that I was told this is a HIPPA violation.**

Firstly I want to state that having recently taken the HIPPA training I am certain that I have not violated any of its rules.

Every day I handle customer's private information, I make copies of Medicare cards, Social Security cards, birth certificates and paystubs. I do not keep their information. When I place an item in the shredding bin which is under my desk I am not keeping the customer private information. They are in the shredding bin to be shredded as soon as I have some extra time. When I put work that needs to be scanned and uploaded in my desk, it is work to be done later, it is not me keeping the customer's information. When I do a transaction during the day, that I may want to check it out later to make sure it goes through and that I did it correctly. I am not keeping the customers private information, it is in my desk safely so that I can verify it later.  My desk is very close to the customer service window so I try not to not keep documents on my desk, I usually put items inside my desk.

When I have a day off Patricia Herker, LOA goes through my desk and recycle bin removing documents and holding them in her office.

**Failure to follow directives from the LOA and insubordination.**

I try to go on my breaks and lunch in a timely manner, however if I am serving a customer I cannot abruptly leave because it is my break time.

When the Office Associate returns from her lunch at 1pm, I cannot get up and leave for my lunch right away because I have to communicate to her regarding any customers that may be waiting in the lobby or any other pertinent information.

 I would like to suggest that moving my lunch break to 1:10 pm - 2:10 pm would be more advantageous.

I have been trying to email Patricia Herker, LOA, at her request, to let her know whenever I have had to leave late for break or lunch.

(The emails are in the attachment **D**)

On August 14th Patricia Herker, LOA documented falsely in an email that I did not register a 155 case correctly. She also documented falsely in the email that I failed to follow the directive.

(The email is in the attachment **E**)

On July 22nd Patricia Herker, LOA documented falsely in an email that I had put the mail away incorrectly. I explained to her that I was not the one who did the mail on July 21. However, in the copies of paperwork which are given to me by her at the Pre-Disciplinary meeting, she did not include the email in which I explained the situation.

(The complete email conversation is in the attachment **F**)


Thank You,


Jennifer Dunkley



Bruce Rauner, *Governor*                    Illinois Department of Human Services                    **James T. Dimas,** *Secretary*

## INTEROFFICE MEMO

DATE:     09/08/2017
TO:       JENNIFER DUNKLEY
FROM:    PATTY HERKER
SUBJECT: PRE-DISCIPLINARY MEETING

I have scheduled a pre-disciplinary meeting for Friday, September 8, 2017 at 10:00 AM. You have a right to be represented by the Union at the meeting. If you so choose to be represented you may contact them or I can.
Failure to follow directives from the LOA and insubordination that have been discussed during interim evaluation, counseling, previous Pre-Disciplinary meeting and oral reprimand. You refused to complete the Postage Meter Report for July after being told that it was your responsibility to complete on 9/1/17 and have been completing this assigned task since 01/2017. As of today, 9/6/2017, you still have failed to complete this task. Also, as previously discussed, you failed to register applications timely. We have 5 TANF applications that were never registered until 9/1/2017 that were date stamped for August dates that you were in the office or returned the next day to register.

*Patty Herker* 9/8/17

*Jennifer Dunkley*

Cc: LOA
   AFSCME Representative: Lisa Eden
   RICHARD STARR

9/15/2017   Rebuttal to the Pre-disciplinary meeting of Friday, September 8, 2017

This is a response to the charges of:

1. Refusal to completer the Postage Meter Report after being told on 9/1/ 17 it was my responsibility to complete it.

The postage meter report is done once at the end of each month. Usually the refill and summary information is printed from the postage machine. The postage report form is either filled out by the Public Aid eligibility Assistant or the Office Assistant. The postage report then goes to Patricia Herker, LOA for her signature. It is then returned to the PAEA or OA to be emailed to Veronica Newton at head Office with cc to Patricia Herker, LOA. The task of completing the postage report is primarily the job of the Office Assistant who sits at the front desk. When our former Office Assistant left in October 2016 I assumed the responsibility of the doing the postage report because the position was not filled immediately. In March 2016 an Office Assistant was hired and I trained her for the receptionist tasks, this included the task of doing the postage meter report. Since then I have continued to help with this task whenever I can and with any other Office Assistant task seeing that my job role is to back up the Office Assistant. We usually remind each other about the postage meter report each month and take turns filling it out and then giving it to Patricia Herker, LOA to be signed.  After receiving back the signed copy we would email it to Veronica Newton at head office.

There was a human error with the July postage report in that neither I,  the office assistant, nor the LOA seem to have remembered about doing the July postage report. The missing July postage report was brought to our attention when the Office Assistant received an email in on August 31st from Veronica Newton saying that she did not receive our July postage report. We are not sure if it was done and given to the LOA and she forgot to sign it and return it to us, or if all three of us forgot that it was due at the end of July.

When the office assistant received the email from region about the missing July postage report she went ahead and did the August report. Since the LOA was out of the office away on training the office Assistant emailed the report to Veronica Newton without the LOA signature.

On 9/1/2017 Patricia Herker, LOA sent an email to me demanding to know why I did not do the July postage report on time. She went on to state that this task was assigned to me and the Office Assistant was the back up. (See attachment B) This assignment was never stated to me by Patricia Herker, LOA. In the office WRAP the job task of doing the postage report is at level D for the clerical person who is the Office Assistant. On the screener's WRAP for the PAEA tasks the postage report is at level E and F. Since we are supposed to work our WRAP starting with item A as top priority it means that the PAEA is the backup for the postage report. (See attachment A)

*I have not been insubordinate nor have I refused to complete the July postage report. On 9/1/2017 Patricia Herker, LOA did not ask me to complete the July postage report. In her email she asked for an explanation as to why the July report was not completed. (See attachment B) She did not ask me to do the July Postage Report, in addition, the Office Assistant had printed the refill receipt and funds report for the August postage report which she turned in on August 31st. This action taken by the Office Assistant may have made it impossible on 9/1 to print the funds report and refill receipt for the July postage report. (See Attachment C)*

I am sorry that the July postage report was not done and I am happy to try and rectify this matter if it is possible. However, I started doing these postage reports in January 2017 and we have missed only one. We only have 3 others postage reports in our records. They are 1/4/2017 for December 2016, 12/2/2016 for November 2016 and July 29th, 2015 for July. It seems that someone missed quite a few postage reports between July 2015 and November 2016. (See attached D for 11/16 and 7/15)

This is another example of Patricia Herker, LOA targeting and being racially discriminatory towards me, seeing that there were no repercussions for the Office Assistant for their role in this incident.

2.   I did not register five TANF (Work and Training) applications.

Our Local Office is task based this means that the work load is tasked based and job tasks are rotated about every six weeks. On 9/1/2017 all the job tasks in the office were rotated including the TANF (Work and Training) jobs task which was rotated to another caseworker, namely Phyllis Atchinson. (See attachhed A)

On 9/8 during the pre-disciplinary meeting, Patricia Herker, LOA gave me the case numbers to four of the cases of which she was accusing me of failing to register. I told her I would need some time to look at the cases before commenting on them. After the meeting I ran the case numbers in the computer system. One of them was on a day that I was out of the office and on another one the customer was logged in by the Office Associate. I did not recognize the other two names so I went to Phyllis Atchinson, HSCW to see if I could look at the paper applications that matched the case numbers. (See attached E)

I could not figure how I could have missed these applications so I asked Phyllis Atchinson, HSCW where did she find those unregistered applications. Phyllis stated that when the job task were being rotated on September 1st, 2017, the caseworker who previously was working on TANF (Work and Training) gave her all the work that was in a pile in her office. Phyllis said she found these unregistered TANF applications in that pile of left over work from the other caseworker. Phyllis stated that she then went ahead and registered the five TANF applications.

*I did not register those 5 TANF applications because I never received them. They were in the possession of the TANF case worker and she failed to register them in a timely manner.*

I believe this is another example of Patricia Herker, LOA fabricating and falsifying information. Another incident occurred in which I believe Patricia Herker, LOA sent an email to me with misleading information. On August 21, 2017 a customer called to inquire about her medical case which should have been reinstated to be active. It was not showing as active in the system and there were no notes saying the case was worked on by any case worker. I sent an email to ask Patricia Herker, LOA about the case, her reply was that we were in black out and the information could not be seen, but actually we were out of blackout since (August 18, 2017) and the case was not showing as being updated. (See attached F). In my experience with Patricia Herker, LOA these fabrications and falsifications are a common practice and they are detrimental to my career.

Every working day I give 100% and more on my job and I am constantly faced with targeting and discrimination from Patricia Herker, LOA.

Jennifer Dunkley

*Jennifer Dunkley* (signature)

9/15/2017

| Occurrence | Unauthorized absence with call-in |
|---|---|
| 1st | Counseling |
| 2nd | Oral reprimand |
| 3rd | Written reprimand |
| 4th | 2nd Written reprimand |
| 5th | 1 day suspension |
| 6th | 3 day suspension |
| 7th | 5 day suspension |
| 8th | 7 day suspension |
| 9th | 10 day suspension |
| 10th | 15 day suspension |
| 11th | 20 day suspension |
| 12th | Discharge |

May 10, 2018

Being the only black employee at Montgomery County FCRC was very challenging in that Patricia Herker, Local Office Administrator because of my race, targeted me.

I contacted the AFSCME for support. Lisa Eden who was the Union Steward for my office came to discuss my concerns about the job. After the first meeting Lisa Eden gave me counseling in regards to my job situation, she told me that I should "play nice". After the second meeting when my LOA brought disciplinary charges against me she counseled me that "maybe this job is not for you, you should start looking for another job.

At our next meeting Lisa Eden she told me that the union had decided that they would not ensue with any grievances on my case. I inquired further as to what was her purpose of coming to the meetings and I was told by Lisa Eden that she was there to make sure that the LOA was following all the steps correctly within the disciplinary process. When Lisa Eden, Union Steward came to the Montgomery County office to attend my disciplinary meetings, after the meetings she would spend time fraternizing with Patricia Herker, LOA. Before becoming the LOA for Montgomery County office Patricia Herker was the union representative for our office.

Even though I had initially contacted the union for representation I began to doubt the integrity of Lisa Eden and he willingness to represent me in a fair and non-prejudicial manner. Because of this I became reluctant to having Lisa Eden represent me at meetings with the LOA. I contacted Melanie Hoyle for help several times in hopes of finding a resolution. The suggestion was made that someone else from the union could represent me but that never came to fruition. On one occasion when Lisa Eden was sick another union representative came to represent me at one of my disciplinary meeting, The union representative name was Landon page.

Patricia Herker, LOA racial discrimination and targeting of me resulted in the following actions.

**(Exhibit A)**

5/10/17 Unfavorable evaluation
5/15/17 Counseling
6/19/17 Pre- Disciplinary meeting
6/26/17 Recommendation for a five-day suspension
7/3/17 five-day suspension
7/11/17 Pre-disciplinary meeting
7/13/17 Oral reprimand for unexcused absence
8/7/17 seven-day suspension
8/17/17 Pre- Disciplinary Meeting
9/8/17 Pre-disciplinary meeting

During this onslaught by Patricia Herker, LOA; Lisa Eden, Union Steward only filed one grievance on my behalf. I believe Lisa Eden's failure to represent me was due to racial discrimination.

**(Exhibit B)**

For every occurrence I submitted a rebuttal to the LOA and to Lisa Eden. However no merit was given to my account of the situation. Lisa Eden was racial discriminatory in her response to my rebuttal by not taking into account my side of the story and the evidence I presented. I stated several times to Lisa Eden that my LOA was using false information and false documentation but my request for some recourse was disregarded.

An example of this disregard happened on the incident of the falsifying of records by Patricia Herker , LOA in giving me an unexcused absence. I had explained to Lisa Eden that the LOA had approved my request for time off but at the time I could not find that paperwork. Lisa Eden then communicated to me that she could file a grievance but it would most likely not be successful. She asked me if I still wanted her to file the grievance and I told her yes to go head and file it. I did not hear from her again about any information regarding filing the grievance. However, in the paperwork included in the AFSCME's response to my charge of racial discrimination I noticed that Lisa Eden filed the grievance # 628624 and had taken the time to request information from Patricia Herker, LOA concerning her side of the story and based on the sole response from the LOA the grievance was submitted and denied the same day. Lisa Eden was racially discriminatory in that she did not give any merit to my account of the situation; she was racially discriminatory in that she did not offer me the opportunity to submit my information as to what actually happended. I was later able to find the original approved request that was signed by Patricia Herker, LOA even though Patricia Herker had falsely presented a signed denied request as evidence.

In her email regarding the issue Lisa Eden chided me without investigating the situation. Lisa Eden also chided me when my LOA complained to her that I had missed 42 phone calls. Even though Lisa Eden knew that I was the only worker assigned to answer phone call from 5 incoming lines into the office. She did not suggest to the LOA to have another worker help with the phones instead she told me that I should try harder and be better at multi-tasking. Because of racial discrimination Lisa Eden failed to represent me in this situation instead she sided with the white supervisor.

**Failure to provide training**

When Janet Schwarz retired in December 31st,2016 we had a temporary LOA (Janelle Clemens) for four months, she was at the office one day each week, during this time I was put on track to be trained for the job tasks within my Public Aid Eligibility Assistant position. Janet Schwart had

refused to train me for these tasks and had sent other works to other office to train for some of the task that I am supposed to be performing. Some of them are to do the payroll, ordering supplies, Issue link card and inventory. Between January and April 2017 Janelle Clemens arranged for me to have access to these systems and arranged for current office staff to train me in these areas, however my co- worker did no train me, they were always too busy or something would come up, I only received a few hours training in the link and one or two hours in payroll from Becky McGill who was always too busy for necessary training.  When Janelle Clemens was not in our office Patty Herkerw took charged and she worked to prevent me from getting trained. When Patty Herker became LOA on April 1st, she had the Office associate, who is white, train to do the payroll.

**Transferring office**

Lisa Eden contacted me to say that administration had contacted her to offer for me to transfer to another office without any of my disciplinary following me, I could begin in the new office with a clean slate. I told her that I would be happy to transfer as soon as possible but then things started to get delayed. I believe Lisa Eden was causing delays because of racial discriminatory motives, which could have caused me to be discharged from my position before the transfer came through. I got a bit anxious and emailed Lisa Eden about the transfer. I also called Melanie Hoyle to talk about it; eventually I decided to put in my own request for a transfer to the Clinton County Office. The other office that the union and administration were talking about was the Carlinville office.  I was transferred to the Clinton county office. I believe my transfer could be expedited because I took the initiative to send in my transfer request to the administration.

**Failure to file grievance**

On August 7th I receive a seven-day suspension from Patricia Herker, LOA for which I had not been given prior notice. I had taken time of on Friday, August 4th, 2017. When I returned to work on Monday, August 7th I signed in and went to my desk. It was at this point that I got a message for Patricia Herker, LOA to come to her office. She had also called in Phyllis Atchinson (staff) as a witness. Patricia Herker, LOA told me that I was suspended for 7 days starting on Monday, August 7th, 2017.  She gave me the paperwork to sign and said I should turn my keys in and go home. Patricia Herker, LOA said she had not given me prior notice about the suspension was because I was off on Friday 4th. However, there is a contact phone number for me in my office file, which is accessible to Patrica Herker, LOA. I was not given a telephone call; there were no messages on my answering machine from Administration or the Union.

I had arrived at work on Monday morning, August 7th, and then I had to gather my things and go home. Other staff was asking me why I was leaving; needless to say it was a very embarrassing situation. I feel Patricia Herker, LOA to embarrass me, did this intentionally.

When I returned to work on Monday, August 14th, 2017 I sent the suspension notice in an email to Lisa Eden. She failed to investigate or file a grievance on my behalf regarding this seven- day suspension that began on August 7th, 2017.  I believe Lisa Eden disregard for my request and failure to represent was due to racial discrimination.

In contrast, to Lisa Eden's racial discrimination and failure to represent, Landon Page, who is black, his fairness in representation was evident even though he only came to one meeting. After the meeting Landon Page emailed me with information regarding my case. When he received my rebuttal he asked questions about the details and informed me of the violations that Patricia Herker, LOA was making.  He also advised me on grounds on which he would file a grievance and how he would respond if the LOA pursued further disciplinary action against me.

I feel that Patricia Herker, LOA was emboldened by Lisa Eden's lack of action and failure to represent me. Lisa Eden's failure to represent me was due to her own racial discrimination against me.

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Jennifer Dunkley | From: | St. Louis District Office |
|---|---|---|---|
| | 108 S. Spruce St | | 1222 Spruce Street |
| | Greenville, IL 62246 | | Room 8.100 |
| | | | Saint Louis, MO 63103 |

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | Sean J. Oliveira, | |
| 560-2018-00104 | Investigator | (314) 539-7847 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐   Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

SEP 2 7 2018

Enclosures(s)

**James R. Neely, Jr.,**
**Director**

*(Date Mailed)*

cc:   **Susan Osthus**
**President**
**AFSCME LOCAL 2600**
**205 N Michigan Ave, Suite 2100**
**Chicago, IL 60601**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS**    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice.** Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS**    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10 --** *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION**    --    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE**    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 560-2018-00104 |

| Illinois Department Of Human Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Jennifer Dunkley** | **(618) 664-7343** | **1962** |

| Street Address | City, State and ZIP Code |
|---|---|
| **108 S. Spruce St, Greenville, IL 62246** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **AFSCME LOCAL 2600** | **500 or More** | **(217) 753-2600** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1306 S. 6th Street,  Springfield, IL 62703** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest          Latest |
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | **07-27-2017     07-27-2017** |
| ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | |
| ☐ OTHER *(Specify)* | ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I. I am a member of the above listed union.  My union representative at the time of the discrimination was Lisa Eden, White.**

**II. I was subjected to discrimination in the workplace by my supervisor.  As a union member, I sought representation by Ms. Eden on several occasions.  On August 14, 2017, I requested the union to file a grievance for falsification of documentation, which resulted in my unwarranted suspension for five days.  Ms. Eden refused to file the grievance.  On September 1, 2017, I again asked Ms. Eden to file a grievance on my behalf due to Respondent denying me training.  Once again, Ms. Eden refused to file my grievance.  I endured racial discrimination in my workplace without the backing from my union.**

**III. I believe I have been discriminated against due to my race, Black, in that my union failed to represent me, in violation of Title VII of the Civil Rights Act of 1964, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct. | 2017 DEC 12  AM 9: 44 |
| *12/9/2017*  — Jennifer Dunkley | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*   ST. LOUIS DISTRICT<br>EEOC<br>RECEIVED |
| Date          Charging Party Signature | |

# ARTICLE III

## Non-Discrimination

### Section 1.   Prohibition Against Discrimination

Both the Employer and the Union agree not to discriminate against any employee on the basis of race, sex, sexual orientation, creed, religion, color, marital or parental status, age, national origin, political affiliation and/or beliefs, nor shall the parties discriminate against any employee with a disability, or for other non-merit factors.

### Section 2.   Union Activity

The Employer and the Union agree that no employee shall be discriminated against, intimidated, restrained or coerced in the exercise of any rights granted by the Illinois Public Labor Relations Act, Illinois Revised Statutes, 5 ILCS 315/1 et seq. (P.A. 83-1012) or by this Agreement, or on account of membership or non-membership in, or lawful activities on behalf of the Union.

### Section 3.   Membership Solicitation

Neither the Union nor its members shall solicit membership during an employee's work time.

### Section 4.   Equal Employment/Affirmative Action/ADA/FMLA

The parties recognize the Employer's obligation to comply with federal and state Equal Employment Affirmative Action Laws, the Americans with Disabilities Act and the Family and Medical Leave Act (including intermittent leave as required).

# ARTICLE IV

## Checkoff/Fair Share

### Section 1.   Deductions

The Employer agrees to deduct from the pay of those employees who individually request it any or all of the following:
   a)  Union membership dues, assessments, or fees;
   b)  Union sponsored credit union contributions;
   c)  P.E.O.P.L.E. contributions.
Request for any of the above shall be made on a form agreed to by the parties and shall be made within the provisions of the State Salary and Annuity Withholding Act and/or other applicable State statutes and/or procedures established by the Comptroller.

An employee who has previously authorized payroll deductions pursuant to this Section shall continue to have such deductions made and shall not be required to reauthorize such deductions unless the employee has specifically authorized revocation of deductions pursuant to Section 2 of this Article or has to re-sign other payroll deduction authorizations.

Upon receipt of an appropriate written authorization from an employee, such authorized deductions shall be made in accordance with law and the procedures of the Comptroller and shall be remitted semi-monthly to the Union in accordance with the current procedures, and at the address designated in writing to the Comptroller by the Union. The Local, State or International Union shall advise the Employer of any increase in dues

or other approved deductions in writing at least fifteen (15) days prior to its effective date.

No later than July 1, 2005, when an employee has authorized payroll deductions for Union membership, the wage stub will state "Union dues" and the amount of deduction. If the employee has not authorized payroll deductions for Union membership, the wage stub will state "non mbr fees" and the amount of deduction.

Any time an authorized deduction would otherwise be discontinued without the employee's specific authorization, the Employer shall notify the employee and shall provide the employee with the necessary cards and/or forms needed to continue said deduction.

### Section 2.   Revocation

All employees covered by this Agreement who have signed Union dues checkoff cards for AFSCME prior to the effective date of this Agreement or who signed such cards after such date shall only be allowed to cancel such dues deduction within the prescribed procedures of the Comptroller.

### Section 3.   Fair Share

Pursuant to Section 3(g) of the Illinois Public Labor Relations Act effective July 1, 1984, the parties agree that the Union certified proportionate share, which shall not exceed the amount of dues uniformly required of members, shall be deducted from the earnings of the non-member employees as their share of the cost of the collective bargaining process, contract administration and the pursuance of matters affecting wages, hours and conditions of employment subject to terms and provisions of the parties' fair share agreement. The amount so deducted shall be remitted semi-monthly to the Union.

### Section 4.   Indemnification

The Union shall indemnify, defend and hold the Employer harmless against any claim, demand, suit or liability arising from any action taken by the Employer in complying with this Article.

### Section 5.   Availability of Cards

If the facility or work location supplies revocation cards, it shall also make available Union deduction cards. Such cards shall be supplied by the Union and shall be made available only upon request of the employee.

# ARTICLE V

## Grievance Procedure

Statement of Principle. The parties agree that in order for the grievance procedure to function efficiently and effectively, all grievances must be resolved at the lowest possible level of the Grievance Procedure. Therefore, the parties agree that all persons responsible for resolving grievances at all levels of the procedure shall be vested with sufficient authority to undertake meaningful discussions and to settle the grievance, if appropriate.

In order to reduce the number of grievances advanced to Step 4 of the Grievance Procedure, upon review, if an Agency or a local Union is found to have a large percentage of its grievances being advanced to the fourth level, a committee made up of representatives of the Union and CMS shall meet and endeavor to determine if all necessary means of resolving the grievances have been exhausted at the lower levels of the

grievance procedure. If it is found that all necessary steps to resolve grievance(s) have not been exhausted, the committee will return the grievance(s) to the appropriate lower step for resolution.

## Section 1.   Grievance

a) A grievance is defined as any difference, complaint or dispute between the Employer and the Union or any employee regarding the application, meaning or interpretation of this Agreement or arising out of other circumstances or conditions of employment.

b) A written grievance shall contain a statement of the grievant's complaint, the Section(s) of the Agreement allegedly violated, if applicable, the date of the alleged violation and the relief sought. The form shall be signed and dated by the grievant. Improper grievance form, date or section citation shall not be grounds for denial of the grievance.

c) Grievances may be processed by the Union on behalf of an employee or on behalf of a group of employees or itself setting forth name(s) or group(s) of the employee(s). Either party may have the grievant or one grievant representing group grievants present at any step of the grievance procedure, and the employee is entitled to Union representation at each and every step of the grievance procedure. The resolution of a grievance filed on behalf of a group of employees shall be made applicable to the appropriate employees within that group. Where available, videoconferencing and teleconferencing may be used to conduct grievance meetings and/or Arbitration Hearings by mutual agreement of the parties.

d) Nothing shall diminish the rights of an employee under P.A. 83-1012 or the rights of the Union under this Agreement.

## Section 2.   Grievance Steps

### Step 1: Immediate Supervisor   *orally doesn't need documented*

The employee and/or the Union shall orally raise the grievance with the employee's supervisor who is outside the bargaining unit. The employee shall inform the supervisor that this discussion constitutes the first step of the grievance procedure. All grievances must be presented not later than fifteen (15) working days from the date the grievant became aware of the occurrence giving rise to the complaint. The immediate supervisor shall render an oral response to the grievance within ten (10) working days after the grievance is presented. If the oral grievance is not resolved at Step 1, the immediate supervisor shall sign the written statement of grievance prepared for submission at Step 2 acknowledging discussion of the grievance. In those circumstances where securing the signature of the first level supervisor who is physically not available to sign would have adversely affected a timely submittal to the second level, the grievance will be submitted to the second level without such signature. A copy of the grievance shall subsequently be provided to the first level supervisor for such signature. The parties recognize that variations from the immediate supervisor, where mutually agreeable, may exist. Where there is no Employer representative outside a bargaining unit covered under this Agreement at Step 1, the grievance shall be filed at Step 2 and the time limits for filing and responding contained in Step 1 shall apply. Notwithstanding the above, the employee and the Union may discuss the

[7]

vested with the authority by the Employer in lieu of filing a grievance. An employee and the Union shall be allowed fifteen (15) working days from becoming aware of the problem, to raise it with the working supervisor who shall have five (5) working days to respond. If an employee or the Union wishes to file a grievance at Step 2 after the discussion with the working supervisor, they may do so no later than fifteen (15) working days after the working supervisor's response is due.

### Step 2: Intermediate Administrator   *warden or secretary 1*

In the event the grievance is not resolved in Step 1, it shall be presented in writing by the Union to the Intermediate Administrator or his/her designee within five (5) working days from the receipt of the answer or the date such answer was due, whichever is earliest. Within ten (10) working days after the grievance is presented to Step 2, the Intermediate Administrator shall meet, discuss and attempt to resolve the grievance with the Union. If the parties are unable to resolve the grievance, the Intermediate Administrator shall render a written answer to the grievance within five (5) working days after such discussion is held and provide a copy of such answer to the Union. The written grievance shall be on an agreed upon form which shall be provided by the Union. The written grievance shall contain a statement of the grievant's complaint, the Section(s) of the Agreement allegedly violated, if applicable, the date of the alleged violation and the relief sought. The form shall be signed and dated by the grievant. Improper grievance form, date or section citation shall not be grounds for denial of the grievance.

### Step 3: Agency Head

If the grievance is still unresolved, it shall be presented by the Union to the Agency Head or his/her designee in writing within fifteen (15) working days after receipt of the Step 2 response or after the Step 2 response is due, whichever is earliest, or within fifteen (15) working days after the Step 1 response, or after the Step 1 response is due, if Step 2 is not applicable. It is agreed that appeals postmarked within the fifteen (15) working days time limit are timely. A copy of said grievance shall also be sent by the local Union to the Union's Step 3 representative. A grievance will not appear on the third level agenda unless a signed and dated grievance has been presented to the Agency Head or designee.

For the Department of Children and Family Services the Union shall be represented by a committee in each agency, made up of Union staff and four (4) bargaining unit members. For the Department of Human Services, the Union shall be represented by a committee made up of Union staff and seven (7) bargaining unit members. For the Department of Corrections/Juvenile Justice, the Union shall be represented by a committee made up of Union staff and five (5) bargaining unit members. For all other Departments, they will be divided into two Multi-Agency Committees for which the Union shall be represented by Union staff and a total of five (5) bargaining unit members on each committee representing all other Agencies on their respective committee. The agencies will initially be divided into the following committees: Committee I shall consist of DVA, ISP, HFS, DNR, DCEO, CMS, IEMA, AGE, AGR, DOI, ICC, ICDD, LETSB, OSFM, and SRS. Committee II shall consist of IGB,

[8]

Lottery, IRB, DES, DPH, DHR, FPR, DOT, Arts Council, GTA, GAC, EPA, CDB, DMA, PTAB, PRB. Placement into other agencies, including other agencies not already assigned to a committee shall be by mutual agreement of the parties. Each agency shall be represented by the agency head or his/her designee.

Agency level grievance meetings shall be convened monthly at a time and place of mutual agreement. The duration of the meeting shall be dictated by the number of grievances pending, but shall be no more than five (5) days per month. After a grievance has been discussed at a Step 3 meeting either party may place the grievance on hold status. There shall only be one hold per grievance and any deviation from same shall be on a case by case basis, following mutual consultation and agreement. If the grievance has been resolved or denied, the parties shall sign the resolution within ten (10) working days.

Attendance at such meetings shall be without loss of pay subject to reasonable attendance requirements. The bargaining unit members of the Committee shall be paid for one-half day travel, if they are traveling from the Chicago area to the Springfield area or equivalent of same. The Committee members will be in paid status the remainder of the work day while and if in preparation for the scheduled grievance meeting. Management reserves the right to verify the use of time for travel and preparation as is stated above.

**Step 4:**
a) If the matter is not resolved at Step 3, the Union, by written notice to the Employer within fifteen (15) working days of the grievance being signed-off by the parties at Step 3, may appeal the grievance(s) to a pre-arbitration staff meeting. It is agreed that appeals postmarked within the fifteen (15) working days time limit are timely.

Pre-Arbitration Staff Meeting - CMS staff and Union staff shall meet on a monthly basis in an attempt to resolve the grievance(s) which are capable of resolution. The duration of the meeting shall be dictated by the number of grievances pending, but shall be no more than five (5) days per month. Such staff shall have the full authority to resolve those cases moved to the pre-arbitration level. If the grievance has been resolved or moved to arbitration by the Union, the parties shall sign the resolution within ten (10) working days.

b) **Arbitration**
   **Expedited**
   1. The parties agree to use an expedited arbitration system for all non-priority grievances, except as otherwise provided herein. The arbitrator shall be assigned from a designated panel. The arbitrator shall be a member of the Expedited Panel agreed upon by the parties. After the parties have signed the Step 4 resolution moving the grievance to Expedited arbitration, the parties shall arrange a place and date to conduct the hearing within a period of not more than sixty (60) days. Nothing herein precludes multiple cases being heard on the same day before the same arbitrator.
   2. If either party concludes that the issues involved are of such complexity or significance as to warrant referral to the Regular Arbitration Panel, that party shall notify the other party of

same in advance of twenty (20) working days prior to the scheduled time for the expedited arbitration. If there is a cancellation fee, that party shall bear the cost.

3. The hearing shall be conducted in accordance with the following:
   a) the hearing shall be informal;
   b) no briefs shall be filed or transcripts made;
   c) there shall be no formal rules of evidence;
   d) the hearing shall normally be completed within one day;
   e) if the parties mutually agree at the hearing that the issues involved are of such complexity or significance as to warrant reference to the Regular Arbitration Panel, the case shall be referred to that panel and the parties shall split the arbitrator's cost; and
   f) the arbitrator may issue a bench decision at the hearing but in any event shall render a decision within two (2) working days after conclusion of the hearing. Such decision shall be based on the evidence before the arbitrator and shall include a brief written explanation of the basis for such conclusion. An arbitrator who issues a bench decision shall furnish a written copy of the award to the parties within two (2) working days of the close of the hearing;
   g) the parties agree to attempt to arrive at a joint stipulation of facts and issues prior to arbitration;
   h) the parties shall attempt to limit the number of witnesses and the overall time for the presentation of the grievance so that additional grievances may be presented on the same day. Discussion for the purpose of limiting the length of the arbitration shall take place prior to the date of the arbitration.

4. A decision by a member of the Expedited Panel shall be final and binding, except it shall not be regarded as precedent or be cited in any future proceeding.

**Regular Arbitration**
1. Only priority grievances as defined in the MOU on Special Grievances, contract interpretation cases or those other disputes as may be mutually determined by the parties shall be scheduled for Regular Arbitration.
2. Arbitrators shall be selected from a permanent regular panel agreed upon by the parties. Each such arbitrator shall commit in advance to a minimum of two dates a month for the calendar year. If the parties are unable to agree on an arbitrator, the parties shall meet to discuss an alternative measure to select an arbitrator.
3. The parties shall make every effort to have the dispute heard at an arbitration hearing to be held within sixty (60) days following the Step 4A signoff.
4. The arbitrator in any given case must render an award therein within thirty (30) days of the close of the record in the case.

c) **Arbitration Procedures**
   Both parties agree to attempt to arrive at a joint stipulation of the facts and issues as outlined to be submitted to the arbitrator.

[9]

[10]

The Employer or Union shall have the right to request the arbitrator to require the presence of witnesses and/or documents. Each party shall bear the expense of its own witnesses who are not employees of the Employer.

Questions of arbitrability shall be decided by the arbitrator. If a question of arbitrability is raised, the arbitrator must first make a determination of the arbitrability of the dispute unless the issue is of such a nature that a determination cannot be made at the hearing. Once a determination is made that the matter is arbitrable or if such preliminary determination cannot be reasonably made, the arbitrator shall then proceed to determine the merits of the dispute. The arbitrator shall neither amend, modify, nullify, ignore, add or subtract from the provisions of this Agreement.

The expenses and fees of the arbitrator shall be paid by the losing party. In cases of split decisions the arbitrator shall determine what portion each party shall be billed for expenses and fees. If either party seeks to vacate an arbitrator's award, such party shall be responsible for all costs including reasonable attorney fees of both parties in seeking and defending against such action, unless the party attempting to vacate the award prevails, in which case each party shall bear its own costs. The cost of the hearing rooms, if any, shall be shared equally. Nothing in this Article shall preclude the parties from agreeing to the appointment of a permanent arbitrator(s) during the term of this Agreement or to use the expedited arbitration procedures of the American Arbitration Association.

The decision and award of the arbitrator shall be final and binding on the Employer, the Union, and the employee or employees involved.

If either party desires a verbatim record of the proceeding (Regular Arbitration only), it may cause such a record to be made, providing it pays for the record and makes a copy available without charge to the arbitrator. If the other party desires a copy it shall pay for the cost of its copy. If the parties agree to utilize a court reporter, the cost shall be shared.

### Section 3. Time Limits

a) Grievances may be withdrawn at any step of the Grievance Procedure without prejudice. Grievances not appealed within the designated time limits will be treated as withdrawn grievances.

b) The time limits at any step or for any hearing may be extended by mutual agreement of the parties involved at that particular step.

c) The Employer's failure to respond within the time limits shall not find in favor of the grievant, but shall automatically advance the grievance to the next steps.

d) If the grievant has filed an appeal with the Civil Service Commission or the Executive Ethics Commission over an identical issue and penalty to that employee's grievance, the parties agree that the Grievance Procedure will not be applicable and the grievance shall be treated as withdrawn, unless the employee withdraws his/her appeal prior to a hearing being held and the grievance was timely filed and processed by the Union through the contractual grievance procedure.

[11]

the date the employee receives the CMS-2.

### Section 4. Special Grievances/Memorandum of Understanding

Grievances concerning discharge, suspensions pending judicial verdict, demotions, geographical transfers, reclassifications, layoffs, schedule changes pursuant to Article XII, Section 19, and the salary grade placement for new classifications pursuant to Article XXVI, Section 8 shall be processed in accordance with the Memorandum of Understanding.

### Section 5. Number of Representatives and Jurisdictions

The number of Union stewards and the facilities they represent shall be agreed upon locally. The Union shall designate the Union stewards and representatives and shall supply a list of names in writing to the Department of Central Management Services and agency and local level administrators on a quarterly basis. Existing local agreements, except by mutual agreement, shall not be changed.

### Section 6. Time Off, Meeting Space and Equipment Use

a) Time Off: The grievant(s) and/or Union grievance representative(s) will be permitted reasonable time without loss of pay during their working hours to investigate and process grievances. A grievant who is called back on a different shift or on his/her day off as a result of the Employer scheduling a grievance meeting shall have such time spent in the meeting considered as time worked. Witnesses whose testimony is pertinent to the Union's presentation or argument will be permitted reasonable time without loss of pay to attend grievance meetings and/or respond to the Union's investigation. No employee or Union representative shall leave his/her work to investigate, file or process grievances without first notifying and making mutual arrangement with his/her supervisor or designee as well as the supervisor of any unit to be visited, and such arrangements shall not be denied unreasonably. Employees attending grievance meetings shall normally be those having direct involvement in the grievance. The Employer reserves the right to require reasonable documentation of time spent in processing grievances including time spent using the telephone for these purposes. The Employer agrees that such documentation of time shall not be construed to allow supervisors to question the content or merits of the grievance(s).

b) Meeting Space and Equipment Use: Upon request, the employee and Union representative shall be allowed the use of an available appropriate room while investigating or processing a grievance; and, upon prior general approval, shall be permitted the reasonable use of telephone facilities for the purpose of investigating or processing grievances. When feasible, and where equipment is currently available, Union stewards and/or officers may utilize electronic mail and/or facsimile equipment for the purpose of investigating or processing grievances. Such transmission will be primarily to expedite communication regarding such matters, will be reasonable with respect to time and volume, and will be consistent with this Article. Such use shall not include any long distance or toll calls at the expense of the Employer.

[12]

c) The Employer shall not be responsible for any costs or other expenses incurred by employee or Union representatives in the processing of grievances.

d) Interpreters and Interpreting Equipment: The Employer will provide qualified interpreters and interpreting equipment as necessary for a reasonable accommodation.

### Section 7.   Advanced Grievance Step Filing

Certain issues which by nature are not capable of being settled at a preliminary step of the grievance procedure or which would become moot due to the length of time necessary to exhaust the grievance steps, such as those pertaining to Article XXIII, Section 3, may by mutual agreement be filed at the appropriate advance step where the action giving rise to the grievance was initiated.

Mutual agreement shall take place between the appropriate Union representative and the appropriate Employer representative at the step where it is desired to initiate the grievance.

### Section 8. Pertinent Witnesses and Information

Except as otherwise provided in Steps 4(b) and 4(c), either party may request the production of specific documents, books, papers or witnesses reasonably available and substantially pertinent to the grievance under consideration. Such request shall not be unreasonably denied, and if granted shall be in conformance with applicable laws, and rules issued pursuant thereto, governing the dissemination of such materials.

Requests to interview the other party's witnesses shall be made through the appropriate representatives. Each party shall have the right to have its representatives present during all such interviews.

Once the Union has requested the information from the Agency and the request is unreasonably denied, the Union may petition the Director of Central Management Services who shall subpoena the substantially pertinent material and/or witnesses in conformance with the provisions of this Section and his/her statutory powers within ten (10) working days of receiving such request. The operating Agency shall have ten (10) working days to respond to the subpoena. Any delay shall not penalize the grievant.

## ARTICLE VI

### Union Rights

### Section 1.   Union Activity During Working Hours

Employees shall, after giving appropriate notice to their supervisor (including the location and approximate duration of the meeting), be allowed reasonable time off with pay during working hours to attend grievance hearings, labor/management meetings, negotiations of their own agency and/or facility supplemental agreements, meetings covering modifications of supplemental agreements, committee meetings and activities if such committees have been established by this Contract, or meetings called or agreed to by the Employer, if such employees are entitled or required to attend such meetings by virtue of being Union representatives, stewards, witnesses, or grievants, and if such attendance does not substantially interfere with the Employer's operations. Any

[13]

operating agency unless the employee is requesting to attend such meetings or hearings at a worksite that does not have a steward or representative available or the employee is an officer or representative of a conglomerate local representing more than one state agency. For conglomerate locals which cover multiple work locations, only one (1) officer or representative shall be permitted to leave a given worksite and only one (1) officer or representative shall be permitted to visit a given work site of another agency at one (1) time for purposes of this section. Where current practice exists, local union representatives shall be authorized to bring union owned electronic devices, i.e., laptop computers, etc., on state premises for the purposes of performing union business. Abuse of this Section may result in termination of this practice. Extensions of this practice shall be subject to agency/facility supplemental negotiations taking into account legitimate security needs of the agency/facility.

After giving appropriate notice to their supervisor outside the bargaining unit, employees shall be allowed time off without loss of pay to attend certified stewards training, if such attendance does not substantially interfere with the Employer's operations. Such training shall not exceed two (2) work days for each steward for the term of this Agreement. The employee shall provide proof of attendance.

### Section 2. Access to State Premises by Union Representatives

a) The Employer agrees that local representatives and officers and AFSCME staff representatives shall have reasonable access to the premises of the Employer, giving notice upon arrival to the appropriate Employer representative. Such visitations shall be for the reason of the administration of this Agreement. By mutual arrangement with the Employer in emergency situations, Union staff representatives or local Union representatives may call a meeting during work hours to prevent, resolve or clarify a problem.

b) Upon request, the Union shall be allowed the use of electronic mail on a semi-annual basis to solicit personal e-mail addresses of all AFSCME represented employees (excluding Department of Military Affairs). The parties shall meet to discuss the method and content of the solicitation.

### Section 3.   Time Off for Union Activities

Local Union representatives shall be allowed time off without pay for legitimate Union business such as Union meetings, State or area wide Union committee meetings, Union training sessions, State-wide contract negotiations, State or International conventions, provided such representative shall give reasonable notice to his/her supervisor of such absence and shall be allowed such time off if it does not substantially interfere with the operating needs of the Employer. The employee may utilize any accumulated time (holiday, personal, vacation days) in lieu of taking such without pay.

Such time off shall not be detrimental in any way to the employee's record.

Employees absent from work pursuant to this Section shall continue to accrue seniority, continuous service and creditable service during such absences.

[14]

three (3) bargaining unit employees and by a reasonable number of AFSCME staff representatives and local union representatives from facilities or work locations as designated by the Union. The six (6) month agency labor-management meetings may be attended by no more than six (6) bargaining unit employees, except that the Department of Natural Resources is allowed eight (8) bargaining unit employees. The state-wide six (6) month labor management meeting with the Department of Central Management Services shall be attended by no more than fifteen (15) bargaining unit employees.

## ARTICLE VIII

## Work Rules

### Section 1.    Rules of Personal Conduct

The Employer has the right to establish reasonable rules of personal conduct and will notify the employees and the Union within ten (10) working days in advance of any new or modified rules of personal conduct.

### Section 2.    Procedural Work Rules

Prior to establishing or changing procedural work rules or regulations, such as off-duty uniform usages, absent or tardy call-ins, doctors' statements for absences, parking violations and other similar matters, the Employer shall meet with the Union in a timely manner for the purpose of consultation and negotiations. Such procedural work rules and/or regulations shall either be posted or otherwise made available to affected employees.

### Section 3.    State Officials and Employees Ethics Act

Employees shall comply with the provisions set forth in the State Officials and Employees Ethics Act (5 ILCS 430), provided that nothing in this Section shall be deemed to diminish the rights, privileges, or remedies of a State employee under any other federal or State law, rule, or regulation or under any collective bargaining agreement or employment contract.

## ARTICLE IX

## Discipline

### Section 1.    Definition

A. The Employer agrees with the tenets of progressive and corrective discipline. Disciplinary action or measures shall include only the following:
a) Oral reprimand;
b) Written reprimand;
c) Suspension (notice to be given in writing); and
d) Discharge (notice to be given in writing).

Disciplinary action may be imposed upon an employee only for just cause. An employee shall not be demoted for disciplinary reasons. Discipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period of time to investigate the matter.

In any event, the actual date upon which discipline commences may not exceed forty-five (45) days after the completion of the pre-disciplinary meeting.

[17]

The parties recognize that counseling and corrective action plans are not considered disciplinary actions.

B. All agencies, boards, and commissions with employees covered under the Master Contract shall be bound by the Affirmative Attendance Memorandum of Understanding.

An employee shall, whenever possible, provide advance notice of absence from work. Absence of an employee for five (5) consecutive work days without reporting to the Employer or the person designated by the Employer to receive such notification may be cause for discharge. The above provision shall not apply so long as the employee then notifies as soon as it is physically possible.

### Section 2.    Manner of Discipline

If the Employer has reason to discipline an employee, it shall be done in a manner that will not embarrass the employee before other employees or the public.

### Section 3.    Suspension Pending Discharge

The Employer may suspend an employee for up to thirty (30) calendar days pending the decision whether or not charges for discharge shall be filed against the employee and such actions shall not be subject to Article V, Grievance Procedure. If suspension pending discharge is replaced by another disciplinary action, written notice will be issued and such action may be subject to the grievance procedure.

### Section 4.    Pre-Disciplinary Meeting

For discipline other than oral reprimands, the Employer shall hold a pre-disciplinary meeting. Pre-disciplinary meetings and employee review hearings shall be held during the employee's worktime. If arrangements for such cannot reasonably be made, the hearing shall be scheduled immediately preceding or immediately following the employee's shift on the employee's workday. An employee whose hearing begins after the end of his/her shift shall be paid from the end of his/her shift through the end of his/her hearing at the appropriate rate. An employee whose hearing begins before the start of his/her shift shall be paid from the time the hearing is scheduled through the start of the employee's shift at the appropriate rate. Should the hearing be postponed or rescheduled at the request of the employee and/or the Union at a time other than before, during, or after the employee's shift, provisions for payment shall not apply. An employee's Working Supervisor may be allowed to conduct pre-disciplinary meetings under supervision of a non-bargaining unit supervisor. The role of Working Supervisors who are union representatives shall be to provide relevant information or to attend pre-disciplinary meetings to assist in the process. The limitation of said duties shall not be detrimental in any way to the Working Supervisor's record.

Prior to notifying the employee of the contemplated measure of discipline to be imposed, the Employer shall notify the Union of the meeting and reasonably in advance of such meeting shall provide the Union with the alleged infraction and shall make every reasonable effort to provide all documentation being used by the Employer to substantiate the alleged infraction. The Employer then shall meet with the employee involved and inform him/her of the reasons for such contemplated disciplinary action including any names of witnesses and copies of

[18]

pertinent documents. Employees shall be informed of their rights to Union representation, as requested in such, if so requested by the employee, and the employee and Union representative shall be given the opportunity to rebut or clarify the reasons for such discipline. If a rebuttal is not presented at the time of the pre-disciplinary meeting, a rebuttal shall be provided within five (5) work days by the employee or the Union, provided that the documentation has been supplied reasonably in advance of the meeting as set forth in this section.

Reasonable extensions of time for rebuttal purposes will be allowed when warranted and if requested. If the employee does not request Union representation, a Union representative shall nevertheless be entitled to be present as a non-active participant at any and all such meetings. Except for discipline pursuant to an agreed upon time abuse policy, the current procedure for pre-suspension/pre-separation hearings in Cook County Public Aid shall continue, unless amended by the parties in supplemental negotiations.

## Section 5.   Oral Reprimands

In cases of oral reprimands, the supervisor must inform the employee that he/she is receiving an oral reprimand and of their right to Union representation, which shall be provided if so requested. The employee shall also be given reasons for such discipline, including any names of witnesses and copies of pertinent documents. Notations of oral reprimands placed in the employee's personnel file shall be provided to the employee and the Union.

## Section 6.   Notification and Measure of Disciplinary Action

a)  In the event disciplinary action is taken against an employee, other than the issuance of an oral reprimand, the Employer shall promptly furnish the employee and the Union in writing with a clear and concise statement of the reasons therefore. The measure of discipline and the statement of reasons may be modified, especially in cases involving suspension pending discharge, after the investigation of the total facts and circumstances. But once the measure of discipline is determined and imposed, the Employer shall not increase it for the particular act of misconduct which arose from the same facts and circumstances. The Employer shall notify an employee of his/her suspension prior to its effective date. If the Employer is unable to contact the employee, the Employer shall notify the Union prior to the effective date of the suspension.

b)  An employee shall be informed that he/she is entitled to the presence of a Union representative at non-criminal investigatory interviews conducted by an agency's Inspector General or internal affairs unit, the Executive Inspector General or the Illinois State Police Division of Internal Investigations. If such an interview is to be conducted away from the employee's worksite, the employee shall be so notified prior to leaving his/her worksite. In the case of all other non-criminal investigatory interviews, the person conducting the interview shall inform an employee that he/she is entitled to the presence of a Union representative not later than the commencement of the interview, provided that the subject matter of the interview could cause a reasonable person to believe that the employee could be disciplined as a result of the interview.

an employee shall be entitled to the presence of a Union representative at an investigatory interview if he/she requests one and if the employee has reasonable grounds to believe that the interview may be used to support disciplinary action against him/her. Such Union representative may be present during an investigatory interview for the purpose of protecting an employee's rights under the Collective Bargaining Agreement; however, such Union representative shall not act in such a manner so as to obstruct the investigation. It is understood by the parties that an employee's statement, either oral or written, made in investigatory interviews when representation is requested by the employee and denied shall not be used against him/her in any subsequent disciplinary action. All time spent by an employee, including travel time, who is required by the Employer to attend an investigatory interview away from the employee's regular workplace shall be paid by the Employer at the appropriate rate. All related travel costs shall be paid pursuant to the Travel Control Board rules. An employee who signs an investigatory interview statement shall be given a copy of the signed statement upon completion of the investigation, if requested, and in advance of any disciplinary meeting. An employee who is required to attend a subsequent interview(s) shall have the opportunity, if available, to review his/her prior signed written statement(s) at the beginning of such interview(s), upon request. If the signed written statement(s) is unavailable when requested by the employee, the employee shall not be adversely impacted by the Employer's failure to provide said statement(s). Following such an investigation the employee and the Union shall be notified in writing that the investigation is complete. If an investigation of alleged employee misconduct does not lead to discipline the employee shall receive written notification that the investigation is closed without charges being filed, and the allegations of misconduct will not become part of the employee's permanent file nor be used to adversely affect the employee's contractual rights.

c)  Nothing in this Section shall prevent the Employer from relieving employees from duty in accordance with its practice. The employee shall not lose any wages because of such release.

## Section 7.   Removal of Discipline

Any written reprimand or discipline imposed for tardiness or absenteeism shall be removed from an employee's record if, from the date of the last reprimand or discipline, two (2) years pass without the employee receiving an additional reprimand or discipline for such offense. The two (2) year period shall be extended by any leave of absence or disciplinary suspension. Any reprimand for other causes shall be removed from the employee's record based on the above criteria. Such removal shall be at the request of the employee but in any case shall not be used against the employee.

## Section 8.   Polygraph

No employee shall be required to take a polygraph examination as a condition of retaining employment with the Employer nor shall be subject to discipline for the refusal to take such. An AFSCME representative

[19]

[20]

may accompany a bargaining unit employee to a polygraph examination. The representative may review the polygraph questions but may not be present during the administration of the polygraph examination.

## ARTICLE X
### Vacations

**Section 1. Amounts**

Employees, except emergency, temporary and those paid pursuant to Part II, Section 3 of the Pay Plan, shall earn vacation time. No employee on leave of absence may earn vacation except when the leave was for the purpose of accepting a temporary working assignment in another class.

Eligible employees shall earn vacation time in accordance with the following schedule:

a) From the date of hire until the completion of five (5) years of continuous service: ten (10) work days per year.
b) From the completion of five (5) years of continuous service until the completion of nine (9) years of continuous service: fifteen (15) work days per year.
c) From the completion of nine (9) years of continuous service until the completion of fourteen (14) years of continuous service: seventeen (17) work days per year.
d) From the completion of fourteen (14) years of continuous service until the completion of nineteen (19) years of continuous service: twenty (20) work days per year.
e) From the completion of nineteen (19) years of continuous service until the completion of twenty-five (25) years of continuous service: twenty-two (22) work days per year.
f) From completion of twenty-five (25) years of continuous service: twenty-five (25) work days per year.

Probationary employees earn vacation and may use such during their original six (6) months probationary period at the discretion of the Employer. Employees must be in paid status at least one-half (1/2) of the work days of the month to be credited for their earned vacation for that month.

**Section 2. Vacation Time**

Vacation time may be taken in increments of not less than one-half (1/2) day at a time, and any time after it is earned. Supervisors may however, grant employee requests to use vacation time in smaller increments of fifteen (15) minutes after a minimum use of one-half (1/2) hour. Vacation time shall not be accumulated for more than twenty-four (24) months after the end of the calendar year in which it is earned.

Vacation time earned shall be computed in workdays.

After an employee's earned vacation time has been so computed, if there remains a fractional balance of one-half (5/10) of a workday or less, the employee shall be deemed to have earned vacation time of one-half (5/10) of a workday, in lieu of the fractional balance; if there remains a fractional balance of more than one-half (5/10) of a workday, the employee shall be deemed to have earned a full workday of vacation time in lieu of a fractional balance.

[21]

time upon an employee's request for vacation days in increments of five (5) or more. However, no employee shall accumulate more than one (1) day per calendar year by rounding off under this Section.

**Section 3. Interrupted Service**

Computation of vacation time of State employees who have interrupted continuous State service shall be determined as though all previous State service which qualified for earning of vacation benefits is continuous with present service. The rule provided in this paragraph applies to vacation time earned on or after October 1, 1972.

**Section 4. Part-time and Intermittent Employees**

Part-time employees shall earn vacation in accordance with the schedule set forth in Section 1 of this Article on a pro-rated basis determined by a fraction the numerator of which shall be the hours worked by the employee and the denominator of which shall be the normal working hours in the year required by the position. Intermittent employees shall earn vacation in accordance with the current practice.

**Section 5. Vacation Schedules**

Subject to Section 6 and the Employer's operating needs, vacations shall be scheduled as requested by the employee in writing. The Employer shall respond to vacation requests within five (5) work days. Where current practice provides for a quicker response, such practice shall continue. Once scheduled vacation is approved it will only be canceled if the Employer's operating needs require that employee's services. The necessity of an overtime assignment shall not be a consideration in the cancellation of approved vacation. In any event, upon request, vacation time must be scheduled so that it may be taken no later than twenty-four (24) months after the expiration of the calendar year in which such vacation time was earned. If an employee does not request and take accrued vacation within such twenty-four (24) month period, vacation earned during such calendar year shall be lost. Except that the period of time an employee is on an approved leave of absence pursuant to Article XXIII, Leaves of Absence, shall not count toward the twenty-four (24) month period.

**Section 6. Vacation Schedules by Seniority**

By January 31 of each calendar year, employees may submit in writing to the Employer their preferences for different time periods for vacation, provided an employee may not submit more than three (3) preferences. Such request may include vacation through the end of February of the following calendar year. In establishing vacation schedules, the Employer shall consider both the employee's preference and the operating needs of the agency. Where the Employer is unable to grant and schedule vacation preferences for all employees within a position classification within a facility but is able to grant some of such (one or more) employees such vacation preferences, employees within the position classification shall be granted such preferred vacation period on the basis of seniority. An employee who has been granted his/her first preference shall not be granted another preference request if such would require denial of the first preference of a less senior employee. An employee's preference shall be defined as a specific block of time uninterrupted by work days.

[22]

continue participation in the Upward Mobility Program beyond the courses enrolled in at the time the recall notice is issued.

## ARTICLE XVI
### Demotions

**Section 1.   Definition and Procedure**

Demotion is assignment of an employee to a vacant position in a position classification having a lower maximum permissible salary or rate than the class from which the demotion was made. It shall be implemented only for inability to perform the work of the classification.

An operating agency may initiate demotion of an employee by filing a written statement of reasons for demotion with the Director of Central Management Services in the form and manner prescribed. Such written statement shall be signed by the head of the operating agency, and shall contain sufficient facts to show just cause for the demotion. No demotion shall become effective without the prior approval of the Director who shall take into consideration the employee's education, experience, length of service, and past performance.

Vacancies filled by master bargaining unit and/or CU-500 employees as a result of demotion shall not be considered permanent vacancies for the purpose of Article XIX or subject to the posting requirements of Article XIX, Section 2 from the time the employee receives official notice of his/her demotion until the effective date of same.

**Section 2.   Notification**

If the statement of reasons for demotion of an employee is approved by the Director, a copy of the approved statement of reasons for demotion shall be served on the employee by the Director in person or by certified mail, return receipt requested, at the employee's last address appearing in the personnel file and the Union shall also be notified. The effective date shall be no earlier than two (2) weeks after the employee is notified.

**Section 3.   Employee Obligations**

Upon the effective date, the employee shall report for duty to the position to which demoted and such report shall be without prejudice to grieve.

**Section 4.   Salary and Other Benefits of Employee**

On the effective date of the demotion, the salary of such employee shall be adjusted to that step of the new classification pay schedule nearest to but less than his/her current rate of pay.

**Section 5.   Status of Demoted Employees**

A demoted certified employee shall be certified in the position classification to which demoted, and shall not be required to serve a new probationary period; a demoted probationary employee shall serve a new probationary period in the position classification to which he/she is demoted.

## ARTICLE XVII
### Records and Forms

**Section 1.   Attendance Records**

The Employer shall maintain accurate, daily attendance records.

An employee shall have the right to review his/her time and pay records on file with the Employer.

**Section 2.   Records**

All public records of the Employer shall be available for inspection upon written request by the Union.

**Section 3.   Undated Forms**

No supervisor or other person in a position of authority shall demand or request that an employee sign an undated resignation or any blank form. No employee shall be required to sign such a form. Any such demand shall entitle the employee to immediate appeal to the Director.

**Section 4.   Incomplete Forms**

Any information placed on a form or any modification or alteration of existing information made on a form subsequent to it having been signed by an employee shall be null and void insofar as it may affect the employee, the employee's position or condition of employment. Any employee required to sign any form prepared pursuant to this Agreement shall be given a copy of it at the time the employee's signature is affixed.

## ARTICLE XVIII
### Seniority

**Section 1.   Definition**

Seniority for RC-6 and 9 shall, for the purposes stated in this Agreement, consist of the length of continuous service of an employee with their department in an AFSCME bargaining unit(s), except when a previously excluded position enters a bargaining unit pursuant to labor board procedures, seniority for an employee in that position shall consist of the employee's total length of service with their department. An employee who takes a position outside the bargaining unit and subsequently returns to the bargaining unit during the probationary period shall have his/her previous seniority date restored.

Seniority for RC-10, 14, 28, 42, 62 and 63 shall, for the purposes stated in this Agreement, consist of an employee's length of continuous service in an AFSCME bargaining unit(s), except when a previously excluded position enters a bargaining unit pursuant to labor board procedures, seniority for an employee in that position shall consist of the employee's total length of service, with all Agencies, Boards, or Commissions under the jurisdiction of the Governor since his/her most recent date of hire with the Employer, as defined herein. An employee who takes a position outside the bargaining unit and subsequently returns to the bargaining unit during the probationary period shall have his/her previous seniority date restored.

For layoff purposes only, if it becomes necessary to break the tie of two or more employees within an agency in RC-10, 14, 28, 42, 62, or 63