IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER A. DUNKLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:18-cv-2189-DWD |
| | ) | |
| LOCAL 2600 AFSCME,[1] | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| HUMAN SERVICES, | ) | |
| KIMBERLY PELTES, and | ) | |
| MONICA MONROY, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM & ORDER</u>

**DUGAN, District Judge:**

Plaintiff Jennifer Dunkley worked for the Illinois Department of Humans Services ("IDHS") from 2015 to 2020. In 2018 and 2019, she brought claims for racial discrimination against IDHS, her labor union AFSCME Local 2600, and other IDHS employees, including Kimberly Peltes and Monica Monroy.[2] Now before the Court are motions for summary judgment filed by Defendants AFSCME Local 2600, Kimberly Peltes, and Monica Monroy. (Docs. 188 & 191) The motions are fully briefed and ripe for decision. (Docs. 189, 192, 200, 201, 208, 209) For the following reasons, the motions for summary judgment are due to be granted.[3]

---

[1] Defendant AFSCME Local 2600 has consistently identified itself as such and not as "Local 2600 AFSCME." Accordingly, the Clerk of Court is directed to correct Defendant's name in the docket to "AFSCME Local 2600."

[2] The two cases, 18-cv-2189 and 19-cv-1146, were consolidated on May 28, 2020. (Doc. 76)

[3] Dunkley has filed motions to strike Defendants' reply briefs. (Docs. 210 & 212) And Defendants have filed a joint motion to strike a notice filed by Dunkley regarding her exhibits. (Doc. 215) These motions are also

# I.  FACTUAL BACKGROUND

Dunkley began working for IDHS at the Montgomery County Family and Community Resource Center ("Montgomery FCRC") in 2015 as a Public Aid Eligibility Assistant. (Doc. 192-6 at 7) She was the only black employee at the Montgomery FCRC and was a member of a bargaining unit represented by AFSCME Local 2600. (Doc. 192-6 at 9) AFSCME Local 2600 is a local union that represents IDHS employees in Sangamon County, Christian County, and Montgomery County. (Doc. 188-10 at 2) Members of AFSCME Local 2600 are covered by a statewide collective bargaining agreement ("CBA") between the State of Illinois and AFSCME Council 31, which is a statewide labor organization and is separate from AFSCME Local 2600. (Doc. 188-10 at 3)

The first two steps of the CBA's grievance procedures consist of communicating with the employee's immediate supervisor and intermediate administrator, and each are handled by AFSCME Local 2600. (Docs. 188-10 at 4 & 188-11 at 20–21) The third and fourth steps consist of communicating with the agency head and, if unsuccessful, proceeding to pre-arbitration discussions and arbitration. (Doc. 188-11 at 21–22) The third and fourth steps are handled by AFCSME Council 31 and not by AFCSME Local 2600. (Doc. 188-10 at 4)

In March 2017, Dunkley contacted AFCSME Local 2600 President Melanie Hoyle asking to speak to a union representative regarding changes in her duties as a Public Aid

---

fully briefed. (Docs. 210–16) The Court finds that exceptional circumstances existed justifying Defendants' reply briefs under Local Rule 7.1(c). Accordingly, Dunkley's motions to strike are due to be denied. The Court further finds that Dunkley's notice (Doc. 213) was filed to correct a clerical error and caused no prejudice to Defendants. Accordingly, Defendants' motion to strike the notice is also due to be denied.

Eligibility Assistant. (Doc. 188-10 at 4) Hoyle forwarded the request to Lisa Eden, a union steward, and asked her to respond to it. (Doc. 188-10 at 4) Eden and Dena McGill, AFSCME Local 2600 Executive Steward, met with Dunkley in late March 2017. (Doc. 188-10 at 10) At the meeting, Dunkley explained that she felt she was being treated unfairly by her supervisor, Patricia Herker, who was the Local Office Administrator ("LOA") and who had moved Dunkley out of her private office to an open area. (Doc. 188-10 at 9–10) McGill explained to Dunkley that LOAs "can move the office in whatever way they choose." (Doc. 188-10 at 22)

On May 10, 2017, Eden was present at a meeting at which Herker gave Dunkley an unfavorable evaluation. (Doc. 188-10 at 11) Eden did not file a grievance regarding the evaluation. (Doc. 188-10 at 11) She does not normally file grievances over evaluations and has never done so on behalf of a non-black union member. (Doc. 188-10 at 11) On May 15, 2017, Harker issued a counseling to Dunkley in a meeting at which Eden was present. (Doc. 188-10 at 11) Under the CBA, counseling is not considered a disciplinary action. (Doc. 188-11 at 31) AFSCME Local 2600 did not file a grievance after this meeting. (Doc. 38 at 22) Eden told Dunkley that the job might not be a good fit for her and that she should consider looking for other jobs—advice that she has also given to non-black union members. (Doc. 188-10 at 12)

On June 19, 2017, Herker held a pre-disciplinary meeting with Dunkley, at which Eden was present. (Doc. 188-10 at 14) After the meeting, Eden asked Dunkley to let the union review her rebuttal to the meeting before submitting it. (Doc. 188-10 at 14) Dunkley declined to have the union review her rebuttal, citing her belief that Eden had been

"relaxing and fraternizing with Patricia Herker, LOA after the meeting," which Dunkley concluded was "collusion." (Doc. 188-12 at 33) After Dunkley submitted her rebuttal, Herker informed her that she was being given a five-day suspension. (Doc. 188-10 at 17) On June 28, 2017, Eden filed a grievance over the suspension. (Doc. 188-10 at 17) Dunkley emailed Hoyle asking her to withdraw the grievance, but Hoyle refused, citing the need to "preserve the integrity of the Master Contract." (Doc. 188-13 at 16–17) Dunkley's suspension was reversed and expunged from her record. (Doc. 188-16 at 22)

On July 13, 2017, Herker met with Dunkley and issued her an oral reprimand, and Dunkley signed a document waiving union representation at the meeting. (Docs. 188-10 at 18 & 188-13 at 34) Eden does not recall Dunkley requesting a grievance be filed over the oral reprimand, and Eden did not file a grievance over the oral reprimand. (Doc. 188-10 at 19) On August 7, 2017, Herker gave Dunkley a seven-day suspension. (Doc. 188-5 at 7) Eden suggested that Dunkley could file a grievance based on failure to follow progressive discipline. (Doc. 188-5 at 12) But Dunkley requested that a grievance be filed for falsification. (Doc. 188-5 at 14) Eden investigated Dunkley's claim of falsification but found that it could not be substantiated and did not file a grievance over her seven-day suspension. (Doc. 188-10 at 20)

In the fall of 2017, Eden negotiated with IDHS labor relations liaison Rick Starr for Dunkley to be transferred to the Marion County Family and Community Resource Center ("Marion FCRC"). (Doc. 188-10 at 21–22) Dunkley was transferred to the Marion FCRC in October 2017. (Doc. 188-10 at 24) Next, Dunkley worked for IDHS at the Madison County/East Alton Family and Community Resource Center ("Madison FCRC") from

4

September 2018 to August 2019 as a Social Services Career Trainee. (Doc. 192-1 at 1 & 6) A trainee serves a probationary period of up to 12 months and can be certified as a Human Services Caseworker six to 12 months after the beginning of the probationary period. (Doc. 192-1 at 2) During the probationary period, a trainee learns to process and certify applications for public assistance. (Doc. 192-1 at 2) When trainees are learning to certify cases, all of their work is subject to review, known as "one hundred percent review." (Doc. 192-1 at 3) The review may be reduced depending on the trainee's progress. (Doc. 192-1 at 3) Peltes was Dunkley's direct supervisor while Dunkley was a trainee at the Madison FCRC and was responsible for reviewing Dunkley's work during her probationary period. (Doc. 192-1 at 1 & 3)

Dunkley attended a caseworker training course on November 27–30, 2018. (Doc. 192-2 at 2) Monroy works as a trainer in IDHS's Bureau of Training and Development and was the trainer for Dunkley's course. (Doc. 192-2 at 1–2) On November 28, 2018, Monroy sent an email to the Acting Bureau Chief of the Bureau of Training and Development describing Dunkley's poor performance in the course. (Doc. 192-7) The email makes no reference to Dunkley's race. (Doc. 192-7) Monroy's email was forwarded to management at the Madison FCRC. (Docs. 192-8 at 13–14 & 192-9) On December 3, 2018, Ulanda Lloyd, the Madison FCRC's LOA, Peltes, and Scott Lankford, a union representative, met with Dunkley. (Doc. 192-1 at 4) Peltes sent Dunkley a follow-up email afterwards summarizing that Dunkley was informed of Monroy's email, instructing Dunkley that she was to actively participate and follow the trainer's instructions, and reminding her that she was not to conduct interviews or certify cases. (Doc. 192-10 at 2)

5

In January 2019, Lloyd authorized Dunkley to work overtime hours but later revoked that authorization after Peltes told her that Dunkley was not doing enough cases in overtime. (Docs. 192-1 at 4 & 201-1 at 3) On January 28, 2019, Peltes informed Dunkley that she was no longer subject to one hundred percent review. (Doc. 192-1 at 4) On March 23, 2019, Dunkley sent an email to Lloyd, and copied Peltes, making a complaint of retaliation and racial discrimination against Peltes. (Doc. 192-1 at 5) Peltes emailed Dunkley on April 10, 2019, and informed her that she would again be subject to one hundred percent review because of the number of errors she made in recent cases. (Doc. 192-3) Peltes tracked Dunkley's errors on her Case Review Log. (Doc. 192-4)

In May 2019, Peltes drafted a Corrective Action Plan for Dunkley at the direction of the Regional Administrator. (Docs. 192-1 at 5 & 192-11) The Plan lasted for 30 days and provided a detailed list of expectations for Dunkley. (Doc. 192-11) At the conclusion of the plan, Peltes recommended that Dunkley not be certified as a caseworker. (Doc. 192-1 at 5 & 192-13) Her recommendation does not reference Dunkley's race. (Doc. 192-13) On August 20, 2019, Lloyd decided not to certify Dunkley as a caseworker.[4] (Doc. 192-1 at 6) Because she was not certified, Dunkley was demoted to her previous position as a Public Aid Eligibility Assistance at the Montgomery FCRC. (Doc. 192-1 at 6) She left her employment at IDHS in October 2020. (Doc. 192-6 at 13)

---

[4] Dunkley indicated that she disputes this assertion. (Doc. 201 at 9) However, she only asserts that Lloyd was off from work that day and Peltes informed her of the decision. She does not actually assert that Lloyd did not make the decision. Peltes provided a sworn declaration in which she asserts unambiguously that she did not have the authority to certify trainees to become caseworkers and that Lloyd, as the LOA, made the decision not to certify Dunkley as a caseworker on August 20, 2019. (Doc. 192-1 at 6)

6

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing Fed. R. Civ. Proc. 56(a)). *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## III. DISCUSSION

Dunkley brings six specific claims against AFSCME Local 2600 under Title VII and 42 U.S.C. § 1981 and against Monroy and Peltes under 42 U.S.C. § 1983: (1) racial discrimination, (2) hostile work environment, (3) harassment, (4) disparate treatment, (5)

intentional discrimination, and (6) retaliation.[5] Discrimination claims are evaluated under the same standards whether brought under Title VII, § 1981, or § 1983. *Purtue v. Wisc. Dep't of Corrs.*, 963 F.3d 598, 601 (7th Cir. 2020); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 n.2 (7th Cir. 2014). The Court will evaluate AFSCME Local 2600 and Monroy and Peltes's arguments in turn.

## A.   AFSCME Local 2600

Title VII forbids labor unions from discriminating on the basis of race. 42 U.S.C. § 2000e-2(c). To survive summary judgment, Dunkley must provide evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race" caused the union to discriminate against her. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "For example, plaintiffs commonly point to 'ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment.'" *Purtue*, 963 F.3d at 602 (quoting *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020)).

Dunkley argues that AFSCME Local 2600 treated Roberta Meyer, another union member who worked at Montgomery FCRC, more favorably. (Docs. 118-10 at 28 & 188-1 at 13) Specifically, she asserted that Meyer received a promotion. However, to establish discrimination with evidence of disparate treatment of similarly situated individuals, the individuals must be comparable "in all material respects." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368–69 (7th Cir. 2019). Typically, the plaintiff must show

---

[5] The Court dismissed Dunkley's retaliation claim against AFSCME Local 2600 on March 6, 2020. (Doc. 64 at 10)

that the individuals had the same supervisor, were subject to the same standards, and engaged in similar conduct. *Id.* at 369. Dunkley has failed to provide evidence of any of these similarities and even concedes that different union stewards may have assisted her and Meyer. (Doc. 200 at 11) Eden testified that she never filed a grievance on Meyer's behalf or played any role in Meyer's promotion. (Doc. 118-10 at 28) And Dunkley provides no serious argument that a reasonable jury could infer discrimination from AFSCME Local 2600's treatment of Meyer.

Dunkley has not provided any other evidence showing that the union discriminated against her because of her race. She points to many incidents when she believes the union failed to adequately represent her. But none of these incidents show that the union was motivated by Dunkley's race, even assuming union representatives could have done more on her behalf. There is no evidence in the record of any other similarly situated union members who were treated more favorably or any statements or dishonest justifications for disparate treatment suggestive of racial animus. *See Purtue*, 963 F.3d at 602. Therefore, this Court believes that no reasonable jury could find that AFSCME Local 2600 discriminated against Dunkley, and its motion is due to be granted.

**B.     Monroy and Peltes**

Dunkley's claims against Monroy and Peltes fall into three categories: (1) racial discrimination, (2) hostile work environment, and (3) retaliation. The Court will address each category of claims in turn.

*1.     Racial Discrimination*

Dunkley points to Monroy's November 28, 2018, email as evidence of racial discrimination. Monroy's email described Dunkley's poor performance in a training course but did not refer to her race nor suggest that her judgment of poor performance was influenced by her race. Dunkley points to the fact that no white participant in the course was also the subject of a written report by Monroy. (Doc. 201 at 11) Yet, this argument also fails to provide evidence of discrimination. Dunkley has not shown that she was similarly situated to the white participants in the course. She claims that she received a final score of 85% for the course but does not provide evidence of the other participants' scores or their conduct during the course. (Doc. 201 at 11) Without such evidence, the Court cannot find that the other participants were comparable to Dunkley "in all material respects." *See McDaniel*, 940 F.3d at 368–69.

Even if Monroy had shown racial animus against Dunkley, there is no evidence that Monroy was ever the decisionmaker in an adverse employment action taken against Dunkley. *See Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378–79 (7th Cir. 2011) (holding that plaintiff must show that a decisionmaker acted for a prohibited reason to prevail on a Title VII claim). Her letter may have influenced later decisions regarding Dunkley's employment, but there is no evidence that she had authority to make any such decisions herself. Dunkley also cannot succeed under a "cat's paw" theory of liability because she has not shown that Monroy's letter had a "singular influence" over the ultimate decisionmaker. *See id.* at 379. Dunkley has not met her burden to provide evidence that would permit a reasonable jury to find that Monroy discriminated against her based on her race.

Dunkley has also not shown that Peltes ever took an adverse employment action against Dunkley. Dunkley attributes three adverse employment actions to Peltes: (1) the revocation of her authorization to work overtime, (2) her return to one hundred percent review on April 10, 2019, and (3) her demotion to Public Aid Eligibility Assistant on August 20, 2019. However, Dunkley has not met her burden to show that Peltes was responsible for the overtime or demotion decisions. In both cases, Lloyd made the decision. Even if Peltes made recommendations to Lloyd in both instances, Dunkley has also not provided evidence to support a "cat's paw" theory of liability because she has not shown that Peltes's recommendation had a singular influence over Lloyd's decision. *See Schandelmeier-Bartels*, 634 F.3d at 378–79.

As to the return to one hundred percent review, that event does not constitute an adverse employment action. An adverse employment action must be a "materially adverse change in the terms and conditions of employment . . . more disruptive than a mere inconvenience or an alteration of job responsibilities." *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). The return to one hundred percent review altered Dunkley's daily job responsibilities. But Dunkley has not shown that the change constituted a demotion or resulted in a material loss of benefits or "significantly diminished material responsibilities." *Id.*

Even if Dunkley had shown that Peltes took an adverse employment action against her, Dunkley has provided no evidence that Peltes's actions were motivated by racial animus. Dunkley asserts that Peltes treated other white employees more favorably.

11

However, Dunkley fails to show that these other employees were similarly situated to herself. For instance, Dunkley claims that Melanie Cannon was promoted to a caseworker position before Dunkley. (Doc. 192-6 at 111–12) Yet, Dunkley could not provide information about Cannon's qualifications (Doc. 192-6 at 112) and concedes that Peltes was not Cannon's supervisor (Doc. 201 at 12), which alone indicates that the employees were not similarly situated. *See McDaniel*, 940 F.3d at 368–69. Dunkley also points to three other white employees who were not subject to one hundred percent review as long as she was but admits that they all had different supervisors. (Doc. 192-6 at 122) The only evidence she has provided about white employees at Madison FCRC shows that these employees were not similarly situated to her.

Dunkley also argues that Peltes's negative evaluation relied on her claim that Dunkley made numerous errors as a trainee. But Dunkley argues that Peltes's claim is inconsistent with a report titled "October 2020 Quality Control Negative Case Review Findings," which is published by the Bureau of SNAP Integrity and which Dunkley claims does not indicate that she made any errors in her cases. (Docs. 201-1 at 4 & 203 at 11–17) However, the report does little to undermine Peltes's negative evaluation for several reasons. First, nothing in the report indicates that it is an exhaustive listing of all errors made by FCRC staff. Dunkley has not produced evidence showing that the publishers would have included every mistake they believed she had made. Second, the report reflects reviews of negative (denied or cancelled) SNAP cases only. Finally, the report does not name the FCRC staff involved in each case on the report. Without additional evidence from the publishers of the report or someone else with personal

12

knowledge of it, the Court has no way of confirming that none of the mistakes discussed in the report belong to Dunkley. For these reasons, the Court finds that the report does not constitute evidence showing that Peltes's negative evaluation was discriminatory.

Dunkley also asserts that Regional Administrator Angela Imhoff told Peltes that some of the items she had marked as errors "were not to be marked as errors but as FYI." (Doc. 201-1 at 3–4) This evidence too falls short of so undermining Peltes's negative evaluation as to suggest that it was motivated by racial animus. Dunkley simply has not produced sufficient evidence to open the door to an inference of discrimination. For these reasons, the Court believes no reasonable jury could find that Peltes racially discriminated against Dunkley.

### 2. *Hostile Work Environment*

A hostile work environment claim will only survive summary judgment if the plaintiff shows that "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009). Monroy's letter constitutes only a single instance of alleged harassment and therefore was not "severe or pervasive." Further, Dunkley has not shown evidence that the letter was written because she is black. As discussed above, the letter does not mention Dunkley's race, and she has failed to provide evidence suggesting that Monroy treated similarly situated white participants more favorably than her.

Dunkley also has not shown that Peltes created a hostile work environment

13

because of her race. Even assuming that Peltes's actions constituted harassment, Dunkley provides no evidence that they were based on Dunkley's race. As discussed above, Peltes may have treated other employees more favorably, but Dunkley has not shown that those employees were similarly situated to her. And Dunkley has provided no evidence that Peltes treatment of her was racially motiviated. Therefore, no reasonable jury could conclude that Monroy or Peltes engaged in race-based harassment that created a hostile work environment for Dunkley.

### 3.   Retaliation

Title VII prohibits employers from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). The plaintiff must show that there is enough evidence to permit a reasonable factfinder to conclude that the employer's retaliatory motive caused the adverse employment action. *See Igasaki v. Ill. Dep't of Fin. & Professional Regulation*, 988 F.3d 948, 959 (7th Cir. 2021).

Dunkley claims that Monroy's letter was an act of retaliation but fails to point out any complaint or charge she made prior to Monroy's letter. (Case No. 19-cv-1146, Doc. 2 at 16–18) Thus, she cannot establish that Monroy retaliated against her as prohibited by Title VII. Dunkley did make a complaint of discrimination against Peltes on March 23, 2019, and she claims that Peltes demoted her in retaliation for the complaint. (Case No. 19-cv-1146, Doc. 2 at 22 & 27)

Dunkley alleges three acts of retaliation: Peltes gave her an unfavorable evaluation on April 26, 2019 (Case No. 19-cv-1146, Doc. 2 at 20–21); Dunkley was told she could not

14

work overtime in a meeting with Peltes and Lloyd on March 26, 2019. (Case No. 19-cv-1146, Doc. 2 at 22); and Peltes gave her an unfavorable review and demotion on August 21, 2019. (Case No. 19-cv-1146, Doc. 2 at 23–24). As discussed above, the decisions to revoke Dunkley's overtime authorization and to demote her were made by Lloyd, not Peltes. And Dunkley has not shown that the April 26 evaluation constituted an adverse employment action that worked a "materially adverse change in the terms and conditions of employment." *Rabinovitz*, 89 F.3d at 488. Thus, no reasonable jury could find that Peltes retaliated against Dunkley in violation of Title VII.

## IV.  CONCLUSION

For these reasons, it is **ORDERED** as follows:

1.    Defendant AFSCME Local 2600's motion for summary judgment (Doc. 188) and Defendants Monroy and Peltes's motion for summary judgment (Doc. 191) are **GRANTED**.

2.    Plaintiff Dunkley's motions to strike (Docs. 210 & 212) are **DENIED**.

3.    Defendants' joint motion to strike (Doc. 215) is **DENIED**.

4.    At the close of the case, the Clerk of Court shall enter judgment in favor of Defendants AFSCME Local 2600, Monroy, and Peltes.

5.    The Clerk of Court shall **CORRECT** Defendant AFSCME Local 2600's name in the docket as directed in footnote one.

6.    The final pretrial conference currently scheduled for October 14, 2021, and the jury trial currently scheduled for October 25, 2021, are **CONTINUED**

and will be rescheduled after a status conference set for **October 19, 2021 at**

**1:00 PM** at which Plaintiff Dunkley and Defendant IDHS shall be present

to discuss a new trial date.

**SO ORDERED.**

Dated: October 5, 2021

_____
DAVID W. DUGAN
United States District Judge